UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>GANNON KEN VAN DYKE,<br><br>Defendant. | 26 Cr. 156 (MMG) |

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE INDICTMENT</u>**

## TABLE OF CONTENTS

I. Introduction ..... 1

II. Background ..... 3

A. Counts One Through Three ..... 3

B. Count Four: Wire Fraud and Alleged "Property" At Issue ..... 5

C. Count Five: Money Laundering ..... 6

III. Legal Standards ..... 6

IV. Counts One, Two and Three Must Be Dismissed ..... 6

A. The at At-Issue Polymarket Contracts Are Not Swaps Under the CEA ..... 6

1. Statutory Text & Structure ..... 7

2. Dodd-Frank's Legislative History ..... 15

3. The Contracts Are Not "Swaps" Because Of How Payment Is Resolved ..... 19

4. If Ambiguity Exists, the Rule of Lenity Applies ..... 21

B. Constitutional Principles Require Dismissal ..... 21

1. The Constitution Requires that Criminal Statutes be Clear and Definite ..... 22

2. The CEA Count Must be Dismissed Because the CEA Fails to Give Fair Notice That Geopolitical Events Wagers Are Swaps ..... 24

3. The Insider Trading Alleged in Count Three is An Unconstitutional Federal Common-Law Crime ..... 27

a. Neither 7 U.S.C. § 9(1) Nor Rule 180.1 Prohibit Insider Trading ..... 27

b. The Legislative Ambiguity in CEA Section 6(c)(1) Purportedly Filled by Rule 180.1 Is Not Entitled to Deference ..... 29

C. Subpart (iv) of the Swap Definition Does Not Apply For Two Independent Reasons ..... 31

V. Count Four Must Be Dismissed ..... 32

A. The Fraud Statutes' "Property" Requirement ..... 33

1. The Supreme Court's McNally and Carpenter Decisions ..... 34

2. Cleveland, Kelly, Blaszczak, and Chastain Further Limit the Scope of "Property" ..... 36

3. The DOJ Made Its Post-Kelly Position On "Property" Clear: Government Information Must Have Commercial Value to the Government to Qualify as "Property" ..... 39

B. Information About Military Plans Is Not "Property" ..... 41

C. The Indictment Fails to Plead Specific Intent ..... 44

D. Due Process and the Rule of Lenity Further Require Dismissal of Count Four ..... 45

VI. Count Five Must Also Be Dismissed ........ 46
VII. Conclusion ........ 47

## I. Introduction

The government indicted Gannon Van Dyke using two theories: one, novel, never before prosecuted, and unsupported by the law; the other, already rejected – squarely – by the Second Circuit. Criminal courts are not laboratories where prosecutors can test new ideas and hypotheses about whether conduct is criminal. Principles of due process forbid that. We request, respectfully, that the Court end the government's experiment now and dismiss this case.

The indictment alleges Van Dyke made profitable wagers on Polymarket based on information derived from his service as a highly-decorated special forces soldier. The government claims that Van Dyke had confidential information about plans to capture Venezuelan President Nicolás Maduro, and made bets on Polymarket based on that information. Counts One through Three of the indictment allege these wagers violated the Commodity Exchange Act ("CEA") because they amounted to illegal "swap" trading. Count Four alleges Wire Fraud based on the theory that Van Dyke deprived the government of its "property." Count Five, a Money Laundering count, is contingent on Count Four and fails because Count Four does not state an offense.

The novel CEA counts share a fatal threshold defect: Each rests – wholly – on the indictment's theory that the at-issue wagers constituted "swaps" trades. But the CEA does not reach wagers such as the ones charged in the indictment, particularly given that Polymarket and its users themselves decide whether the wagers are successful. By the plain terms and structure of Dodd-Frank, the statutory term "swap" covers financial instruments designed to hedge price risk and facilitate price discovery. Numerous courts have so held. The wagers alleged in this indictment do not qualify, a reading confirmed by every relevant marker of congressional intent.

Even if the term "swap" could conceivably reach wagers of the type described in the indictment, constitutional principles independently require dismissal. The statutory text is too

vague to provide fair notice that the at-issue wagers could be covered conduct. Courts are split on critical definitions, Congress has introduced a dozen bills to address the clear gap in the CEA's application to predictions markets, and the CFTC itself has acknowledged it lacks "clear regulatory lines" regarding the charged conduct. Indeed, the government's CEA theory goes well beyond any interpretation that any branch of government or the public has ever endorsed. And because neither CEA Section 6(c)(1) nor Rule 180.1 prohibits insider trading on its face, Count Three separately requires dismissal as an unconstitutional federal common-law crime.

As for the wire fraud allegations, Count Four lives and dies on one single assumption: that confidential plans for a possible future military operation constitute "property" within the meaning of the wire fraud statute. But this assumption conflicts with binding precedent holding that schemes related to the government's sovereign powers fall outside the bounds of the fraud statutes.

Worse, the government's "property" theory has already been squarely rejected by Second Circuit precedent holding that confidential information cannot be "property" under the fraud statutes unless it has commercial value to the entity that holds it. Indeed, the government has itself proclaimed "it is now the position of the Department of Justice that in a case involving confidential government information, that information typically must have *economic value* in the hands of the relevant government entity to constitute 'property' for purposes of 18 U.S.C. §[]1343." U.S. Remand Brief at 7-8, *United States v. Blaszczak*, Nos. 18-2811, 18-2825, 18-2867, 18-2878 (2d Cir. April 2, 2021) (ECF No. 453). The information described in the Indictment clearly lacks any such value.

While every branch of government, the public, and the private sector take time to consider the implications of innovative technologies like geopolitical events wagers made on prediction markets—and how to properly regulate them—this "overzealous" case has rushed into the breach

relating to a high-profile event. *McDonnell v. United States*, 579 U.S. 550, 576 (2016). In these motions, we rely on the Court to restrain the government according to precedent and statute, as defendants have since the founding of our country.

## II. <u>Background</u>

### A. Counts One Through Three

Counts One, Two, and Three charge violations of the CEA related to Van Dyke's alleged wagers on Polymarket. The indictment calls Polymarket a "prediction marketplace," alleging it enables users to enter into contracts based on scenarios Polymarket lists on its website. The government claims these contracts are dependent on the outcome of event contingencies. The indictment does not specify how Polymarket determines whether to pay wagers in the event of disputes. According to the government, the Polymarket contracts are "swaps," and therefore covered by federal commodities fraud laws. The indictment alleges Van Dyke used confidential government information to make his "wagers," violating a number of statutes.

Count One charges Unlawful Use of Confidential Government Information for Personal Gain under 7 U.S.C. § 6c(a)(3). It assumes the Polymarket contracts are "swaps" and alleges Van Dyke used confidential government information obtained in connection with his military service "to execute swap transactions in the form of binary event contracts for personal gain." Indictment ¶18. Count Two charges Theft of Nonpublic Government Information under 7 U.S.C. § 6c(a)(4)(C). It also assumes the Polymarket contracts are "swaps," and alleges Van Dyke "stole, converted, and misappropriated" government information "relevant to the price of swap contracts regarding military action in Venezuela, and used it to execute swap transactions for personal gain." Indictment ¶20. Count Three charges Commodities Fraud under 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1. Again claiming Polymarket contracts are "swaps," it alleges Van Dyke "used and employed ... a manipulative and deceptive device" by knowingly obtaining "material nonpublic information

in breach of a duty" and "us[ing] it to execute swap transactions for personal gain." Indictment ¶22.

Each of Counts One through Three characterizes Van Dyke's trades as swap transactions. The CEA defines a "swap" as "any agreement, contract, or transaction":

> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;
>
> (ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;
>
> (iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred , including any agreement, contract, or transaction commonly known as—
>
>> (I) an interest rate swap;
>>
>> (II) a rate floor;
>>
>> (III) a rate cap;
>>
>> (IV) a rate collar;
>>
>> (V) a cross-currency rate swap;
>>
>> (VI) a basis swap;
>>
>> (VII) a currency swap;
>>
>> (VIII) a foreign exchange swap;
>>
>> (IX) a total return swap;

(X) an equity index swap;

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap;

(XXI) an emissions swap; and

(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

7 U.S.C. § 1a(47).

**B. Count Four: Wire Fraud and Alleged "Property" At Issue**

Count Four primarily incorporates the allegations of Counts One through Three, but adds allegations that Van Dyke executed Polymarket transactions knowing he had MNPI subject to a duty of confidentiality, "and which information has pecuniary value." Indictment ¶ 24. It describes the MNPI as "classified, nonpublic U.S. Government information about a U.S. military operation

to capture Nicolas Maduro and his wife." Indictment ¶1. Otherwise, it merely recites the statutory language.

### C. Count Five: Money Laundering

Count Five is a standard tagalong § 1957 charge, based on Van Dyke's transfer of some Polymarket wager proceeds to another bank account. The "specified unlawful activity" is solely the alleged wire fraud charged in Count Four, nothing else. Indictment ¶ 26.

## III. Legal Standards

We assume the Court's familiarity with the standards for a motion to dismiss and the Constitutional requirements for a valid Indictment and so do not spend the usual page on them. *See* Fed. R. Crim. P. 7(c)(1); *Apprendi v. New Jersey*, 530 U.S. 466, 489 n.15 (2000); *Russell v. United States*, 369 U.S. 749, 768 (1962); *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000); *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012).

One note on the standards, though, of particular importance for Count Four: The Second Circuit has made clear that just tracking the statutory language is not sufficient where elements of the offense are implicit in the statute, or the statute contains generic terms. *See Pirro*, 212 F.3d at 92-93 (op. of Gibson, J.). Thus, "where [an] indictment track[s] the language of [the] statute but d[oes] not allege … an essential characteristic of the crime, the indictment fail[s] to charge an offense." *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996), *overruled on other grounds, Salinas v. United States*, 522 U.S. 52 (1997).

## IV. Counts One, Two and Three Must Be Dismissed

### A. The at At-Issue Polymarket Contracts Are Not Swaps Under the CEA

The wagers at issue—binary "YES" bets dependent on Polymarket users' interpretations of U.S. military involvement and leadership change in Venezuela by a fixed date—are not "swaps" within the meaning of the CEA. The government's theory treats the CEA's "swap" definition as

broad enough to encompass any event contract with a conceivable downstream economic effect, or any innovative product with an event contingency element. That interpretation *knows no limiting principle* and finds no support in the statute's text, structure, or history. The same interpretation has been rejected by multiple courts deciding analogous questions about sports-events contracts. And, to the extent any ambiguity remains after consulting the text, the rule of lenity requires a narrow reading that does not reach wagers like the ones in this indictment.

*1. Statutory Text & Structure*

Subpart (ii) of the CEA's "swap" definition includes "any . . . contract, or transaction . . . that provides for . . . payment that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency *associated with a potential financial, economic, or commercial consequence*." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added).

Courts first look to the "ordinary meaning" of disputed terms – here, the term "swap." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). If a term has multiple meanings, courts look to the surrounding text and statutory scheme because "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear ... or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 372 (1988) (internal citations omitted). "[A] statute's meaning does not always turn solely on the broadest imaginable definitions of its component words. Linguistic and statutory context also matter." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (cleaned up).

Courts must therefore interpret a statute "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569 (1995), and "fit, if possible, all parts into an

harmonious whole," *FTC v. Mandel Brothers, Inc.,* 359 U.S. 385, 389, (1959). This includes "avoid[ing] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (simplified). In addition, "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

The government reads the phrase "associated with a potential financial, economic, or commercial consequence" as capturing any contingency that might, through enough attenuation, have some effect on a price or market somewhere, however minimal. That reading is overbroad and inconsistent with the CEA's statutory language and structure.

To "associate" means to "join or connect together."[1] The ordinary meaning of Subpart (ii) of the "swap" definition, therefore, refers to contingencies that are "inherently joined or connected with a potential financial, economic, or commercial consequence, without looking at externalities like potential downstream financial consequences." *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 (D. Nev. 2025); *see also KalshiEX, LLC v. Schuler*, No. 25 Civ. 1165, 2026 WL 657004, *5 (S.D. Ohio, Mar. 9, 2026) ("swap" is "a transaction involving financial instruments and measures that traditionally and directly **affect commodity prices**") (emphasis in original). The subjects of the bets alleged here are not "associated with" potential economic effects because they are not inherently economic. And they do not "traditionally and directly affect commodity prices." *Id.* Rather, they relate to specifically-defined scenarios of geopolitical events involving

[1] *Associate*, Webster's New World Dictionary, https://www.merriam-webster.com/dictionary/associate (last visited July 23, 2026).

U.S. law enforcement operations and foreign state leadership. Indeed, as described more fully below, they depend on Polymarket users' *interpretations* of such events and scenarios.

A narrower reading of "associated with" is "symmetrical and coherent" with the rest of the CEA's "swap" definition. *Gustafson*, 513 U.S. at 569. Subparts (i), (iii), and (v) define "swaps" with reference to derivative contracts containing payment obligations tied to external, measurable financial, economic, or commercial variables subject to fluctuation, i.e., rates, indices, commodities, currencies, and securities.[2] In other words, the contracts are *inherently* joined with a financial, economic, or commercial consequence that varies over time. The financial, economic, or commercial consequence is usually the contract's reference point. That makes sense definitionally too: Derivatives *derive* their value from another source. By contrast, a reading of Subpart (ii)'s "associated with" language that includes any event that may have some remote, tangential economic consequence, however small—the interpretation the indictment requires—ascribes "a meaning so broad that it is inconsistent with its accompanying words." *Yates*, 574 U.S.

[2] Subpart (i) includes price-related options, e.g., "put, call, cap, floor, collar, or similar option ... based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind." 7 U.S.C. §§ 1a(47)(A)(i). Subpart (iii) includes a list of 22 types of transactions that hedge commercial risk "based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind." 7 U.S.C. §§ 1a(47)(A)(iii). Subpart (v) identifies agreements based on the "volatility of any security." 7 U.S.C. §§ 1a(47)(A)(v).

Subparts (iv) and (vi) contain gap-filling provisions that accommodate evolving financial products without departing from the statute's enumerated categories. Subpart (iv) includes "an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv). Subpart (vi) includes "any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)." 7 U.S.C. § 1a(47)(A)(vi).

at 543. Indeed, the occurrence or nonoccurrence of *any* event or scenario has the potential to remotely affect some aspect of economic activity.

"Two general principles are [particularly] relevant." *Fischer v. United States*, 603 U.S. 480, 487 (2024). "First, the canon of *noscitur a sociis* teaches that a word is given more precise content by the neighboring words with which it is associated." *Id.* (internal quotation marks omitted). "And under the related canon of *ejusdem generis*, a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes ... that precede it." *Id.* The statute provides an extensive list of the types of instruments falling within its ambit. *See* 7 U.S.C. § 1a(47)(a)(i), (iii), and (v). The import is clear. A geopolitical wager is not a "swap" if it does not bear the hallmarks of the specific instruments explicitly identified in the statute. The contracts at issue here clearly do not for the reasons already discussed. It is no response to cite subpart (ii)'s more general language, because that too cannot be read in isolation and is itself limited by the surrounding text.

The government's essentially unlimited interpretation of Subpart (ii) is also belied by statutory context because the reading would subsume and render superfluous each swap listed in Subparts (i), (iii), and (v). *See Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) (a statute should be read to give effect "to all its provisions, so that no part will be inoperative" (internal quotations omitted)); *Fischer*, 603 U.S. at 487 (courts interpret statutes with "the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it").

A narrower interpretation is also harmonious with the broader CEA statutory scheme and "produces a substantive effect that is compatible with the rest of the law." *United Savings Ass'n of Texas, Ltd.*, 484 U.S. at 372. Indeed, Congress determined that "transactions subject to" CEA

regulation "are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming *price risks, discovering prices, or disseminating pricing information* through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a) (emphasis added). In other words, the CEA regulates transactions that Congress found serve public business interests: derivatives that facilitate hedging and price discovery.

The swaps defined in Subparts (i), (iii), and (v) advance both goals. Each is a contract whose payment obligation is tied to an externally determined reference rate, price, or index that allows parties to transfer, offset, or reallocate future financial, economic, and commercial risk without transferring ownership of the underlying asset. An interest-rate swap offsets exposure to fluctuating borrowing costs; a currency swap offsets exchange-rate exposure; and a weather swap offsets weather-driven revenue volatility. In each case, a party enters the contract to manage pre-existing exposure to a variable its business independently confronts.

Prediction markets, by contrast, loosely facilitate *probability* discovery, not price discovery. An event contract's payoff turns on the yes-or-no resolution of a discrete future event or scenario, so its terms are keyed to the likelihood the event or scenario occurs rather than any underlying variable the contract tracks. The only question is whether the specified contingency occurs. A prediction market trader places a wager because he believes the market has miscalculated the probability of an event. Unlike a swap counterparty, he does not offset existing commercial risk—he creates risk by placing the bet itself. This is gambling, not hedging. *See Board of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905) (distinguishing hedges, where participants contract to "secure themselves against the fluctuations of the market by counter contracts for the purchase or sale…of an equal quantity of the product,

or of the material of manufacture" and the "object [i]s self-protection in business," from a wager, "a speculation entered into for its own sake"); *cf. Warnock v. Davis*, 104 U.S. 775 (1881) (life insurance contract requires "a reasonable ground…to expect some benefit or advantage from the continuance of the life of the assured...[o]therwise the contract is a mere wager").

To understand the hedging versus gambling distinction, consider one prediction currently featured on Polymarket: "Will the Salvator Mundi be publicly exhibited by December 31?"[3] Even this event contingency, ostensibly based on the exhibition of a single painting, has a potential downstream effect on commercial activity, including tourism, insurance, and licensing. But the payment terms are tied to a probability variable rather than a measurable economic variable. And further, the contract lacks information about the contingent exhibit's location, duration, or any other factor that would allow businesses to hedge risk.

The trades here are similar. The Government alleges that in December 2025 and January 2026, Van Dyke placed "YES" bets on the following predictions:

- "U.S. forces in Venezuela ... by January 31, 2026";
- "Maduro out by ... January 31, 2026";
- "Will the U.S. invade Venezuela by ... January 31"; and
- "Trump invokes War Powers against Venezuela by ... January 31".

Indictment ¶11.[4] Although geopolitical events of this nature might have potential downstream economic consequences, these event contingencies were silent as to the success of any military operation, Maduro's successor, U.S. control of Venezuelan oil markets, or any other information

---

[3] *Will the Salvator Mundi be publicly exhibited by December 31?*, Polymarket, https://polymarket.com/event/will-the-salvator-mundi-be-publicly-exhibited-by-december-31.
[4] These predictions allowed traders to pick from a selection of dates. Indictment ¶9.

useful in assessing commercial risk or commodity prices. The wagers facilitated—if anything—personal amusement, not commercial risk management or price discovery.

Moreover, each contract's terms were tied to the event's probability, not to a specific, market-based reference price of measure, like, for example, the Latin America Dated Brent strip[5]—something that is objectively discoverable and agreed upon. Or, for example, one does not have to ask a CBOE employee whether cotton is above $100 a bale or not; the price is public and known. The alleged wagers here, by contrast, require Polymarket traders to decide who won or who lost. For instance, the terms of the "Will the U.S. invade Venezuela by ... January 31" contract stated: "This market will resolve to 'Yes' if the United States commences a military offensive intended to establish control over any portion of Venezuela. . . . The resolution source for this market will be a consensus of credible sources."[6] The contract itself required traders to determine what the United States "intended." But the contract is silent regarding whose intent may be imputed to the United States. Was President Trump's intent controlling? Did Department of Defense leaders or military personnel need to come to agree? What qualifies traders to speculate on what thoughts occurred inside the heads of United States leaders? And who gets to decide what publications are considered "credible sources" and how many equate to a "consensus"? These ambiguities are wholly absent from the resolution of any traditional swap.

---

[5] The Latin America Dated Brent strip measures the average value of Dated Brent—the benchmark price for physical North Sea crude cargoes with assigned loading dates—over the month a Latin American cargo is set to load, captured at the US market close, giving buyers and sellers a market-based reference price for that regional oil instead of a fixed negotiated figure. *Specifications Guide Americas Crude Oil* at 16-17, S&P Global Energy (April 2026), https://www.spglobal.com/content/dam/spglobal/ci/en/documents/platts/en/our-methodology/methodology-specifications/crude-oil/america-crude-specifications.pdf.

[6] *Will the U.S. invade Venezuela by...?*, Polymarket, https://polymarket.com/event/will-the-us-invade-venezuela-in-2025.

For some of the same reasons, multiple courts have decided that wagers relating to sporting events do not constitute "swaps" under § 1a(47)(A)(ii). In *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025), Kalshi, a Polymarket competitor, sued Nevada's state gambling regulatory entities and argued the CFTC had exclusive jurisdiction over it because sporting event contracts constitute swaps under the CEA.

The court rejected Kalshi's argument that a "swap" includes any agreement with a potential economic consequence extrinsic to the parties to the contract, concluding Kalshi's interpretation of the statute "knows no limiting principle." *Hendrick*, 817 F. Supp. 3d at 1027. The court stated:

> Congress did not define a swap as a contract on anything that happens or could happen. So interpreting the statutory terms to include everything anyone can conjure up as a subject to bet on, or that might have some conceivable financial consequence if one is creative enough, is not a reasonable interpretation of the statute.

*Id.* Two other District of Nevada courts deciding whether prediction market wagers based on sporting events constitute swaps found the same. *See N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169 (D. Nev. 2025); *Robinhood Derivatives, LLC v. Dreitzer*, No. 25 Civ. 01541, 2025 WL 3283308 (D. Nev. Nov. 25, 2025).

Similarly, in *QCX LLC v. Nessel*, No. 26 Civ. 710, 2026 WL 1166362 (W.D. Mich. Mar. 10, 2026), QCX, the prediction market exchange doing business in the United States as Polymarket US, brought an action against Michigan's Attorney General seeking to block the state from enforcing its gambling laws against the exchange, arguing that Michigan was preempted by the CEA. As in *Hendrick*, the court rejected the exchange's interpretation of "swap," concluding the exchange's interpretation of the phrase "associated with a potential financial, economic, or commercial consequence" would render the clause "meaningless." *QCX, LLC*, 2026 WL 1166362, at *3. The court concluded: "Anything can potentially have economic ramifications given enough attenuation and happenstance. Reading *associated with* to require an inherent connection to those

consequences rather than a downstream, attenuated consequence reins in the potential chains of association to infinity." *Id.*

A limitless reading of the swap definition also "produces absurd results" that can be avoided by a narrow interpretation that is consistent with the statutory language and structure. *Griffin*, 458 U.S. at 575; *see also KalshiEX, LLC v. Schuler*, No. 2:25 Civ. 1165, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026) (discussing "the Court's obligation to avoid absurdity"). The broad interpretation of the statute advanced by this indictment would sweep every tableside bet on who will win an election, when a political leader will die, or even what color tie a candidate might wear during a debate, into federal regulatory jurisdiction. *See* 7 U.S.C. § 2 (making it "unlawful for any person...to enter into a swap" outside of a designated contract market). Such a "sea change in the regulatory landscape" was never contemplated by Congress, and if it was, Congress "surely would have said so" in clearer language. *Hendrick*, 817 F. Supp. 3d at 1030; *see also McDonnell v. United States*, 579 U.S. 550, 576 (2016) (interpreting statute to avoid federalism concerns); *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (requiring "clear statement" when interpreting "legislation affecting the federal balance").

2. *Dodd-Frank's Legislative History*

Legislative history confirms that wagers of the kind charged in the indictment are not swaps. Dodd-Frank added swaps to the CEA's ambit in 2010. Pub. L. No. 111–203, 124 Stat. 1376 (2010) ("Dodd-Frank"); *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025) (Dodd-Frank "brought much of the swaps market within the CFTC's purview for the first time.").

Dodd-Frank was enacted in response to the 2008 financial crisis, caused, in part, by an unregulated derivatives market that was previously "explicitly exempted" from the CFTC's jurisdiction and which posed a "systemic threat" to the U.S. economy. S. Rep. 111-176, 2, 29-30

(Apr. 30, 2010). None of the legislative history focused on market risk caused by unregulated geopolitical events betting.[7] Rather, the legislative focus was on instruments that "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Only these types of instruments "affected [the] national public interest." *Id.*

This history confirms that wagers like the ones listed in the indictment are not "swaps." Every contemporaneous marker of congressional intent—points to financial derivatives, not betting on whether there will be an "invasion," or what that means. 7 U.S.C. § 5(a). Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), and nothing in the record suggests it meant to sweep all manner of prediction markets event or scenario betting into the swaps regime regulated by the CFTC through the CEA.

The agencies responsible for implementing Dodd-Frank reached the same conclusion. Recognizing the potential overbreadth of the term "swap," the CFTC and SEC jointly promulgated a rule further defining "swap" in 2012. *See* 77 Fed. Reg. 48,208 (Aug. 13, 2012). The agencies stated "[i]n determining the appropriate scope of the rules, the Commissions consider[ed] the types of agreement, contract, or transaction that should be regulated as a swap . . . under Title VII in light of the purposes of the Dodd-Frank Act." *Id.* at 48,211.

---

[7] *See Regulatory Reform and the Derivatives Markets: Hearing Before the S. Comm. on Agriculture, Nutrition and Forestry*, 111th Cong. (09-10) (June 4, 2009), https://www.agriculture.senate.gov/hearings/regulatory-reform-and-the-derivatives-markets; *Over-the-Counter Derivatives: Modernizing Oversight to Increase Transparency and Reduce Risks: Hearing Before the Subcomm. on Securities, Insurance, and Investment of the S. Comm. On Banking, Housing, and Urban Affairs*, 111th Cong. (09-10) (June 22, 2009), https://www.banking.senate.gov/hearings/over-the-counter-derivatives-modernizing-oversight-to-increase-transparency-and-reduce-risks?.

The Commissions sought to define "swap" to "include agreements, contracts, and transactions only to the extent that capturing [them] is necessary and appropriate given the purposes of Title VII, and *to exclude agreements, contracts, and transactions to the extent that the regulation of such agreements, contracts, and transactions does not serve the statutory purposes of Title VII*." *Id.* (emphasis added). As part of this rule, the CFTC and SEC excluded insurance contracts[8]—a category that, under a strictly textual reading, Subpart (ii) would appear to cover—because such contracts do not serve the statute's purposes. *Id*. at 48,212. By doing so, the CFTC and SEC explicitly acknowledged that § 1a(47)(A) has a limiting principle.

Courts analyzing Dodd-Frank's legislative history and purpose agree. The court in *Hendrick* explained, "Congress was bringing risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector, and which had catastrophic ripple effects on the U.S. and world economies during the financial crisis of 2007-2008. Congress was not enabling nationwide gambling on CFTC-designated exchanges." 817 F. Supp. 3d at 1031. The court added, "It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010." *Id.* at 1031-32; *see also Am. Derivatives Exch., Inc.*, 815 F. Supp. 3d at 1185 ("The CEA's language and legislative history show that Congress did not intend such a change and, to the contrary, did not want gambling to take place on CFTC-designated exchanges.").

[8] Of course, the CFTC and SEC did not specifically exclude bets placed on prediction market platforms—which did not gain widespread popularity until early 2025, after a federal appeals court allowed Kalshi to revive its regulated prediction market (*see KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4364204 (D.C. Cir. Oct. 2, 2024)) and Kalshi added sports betting to its platform shortly thereafter—from the "swap" definition.

In *Schuler*, 2026 WL 657004, Kalshi brought an action against Ohio alleging that the state's sports-gambling laws were preempted by the CEA. As in *Hendrick*, Kalshi urged the court to adopt a broad interpretation of "swap" to include sports events contracts. The court rejected Kalshi's interpretation, concluding that "[b]y enacting the CEA, Congress sought to serve the national public interest of 'managing and assuming price risks, discovering prices, or disseminating pricing information' by establishing a system to deter market disruptions, ensure financial integrity, avoid systemic risk, protect market participants from fraud and abuse, and promote responsible innovation." *Schuler*, 2026 WL 657004, at *6 (quoting 7 U.S.C. § 5(b)). "These goals," it held, "are better achieved when a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly affect commodity prices." *Id.* at *6.

Recent legislative proposals further confirm that the alleged event contracts described in the indictment are not "swaps" under the CEA. In just the last few months, Congress has introduced 12 new bills in response to "[c]ertain well-timed trades related to government action [that] sparked concern that government officials or others with access to material nonpublic information may use that information for private gain through prediction market trading." Alexander H. Pepper and Karl E. Schneider, "Prediction Markets Legislation in the 119th Congress," Library of Congress (Apr. 21, 2026).[9] These proposals, which uniformly target conduct not commonly understood to be prohibited by the CEA, include:

- An amendment establishing that the CEA "appl[ies] to illegal trading practices related to 'prediction market contracts.'" *Id.* (quoting Prediction Market RISK Act, H.R. 8148, 119th Cong. (2026)).
- A prohibition on placing wagers on "events where the 'primary underlying characteristic' *is not* 'financial, commercial, or economic' and the event is (1) an action

[9] Available at www.congress.gov/crs-product/IF13207.

undertaken by a government, intergovernmental organization, or government official; (2) an event for which the outcome is under the complete control of any person; or (3) an event for which the outcome is known by any person in advance." *Id.* (quoting BETS OFF Act, S. 4115, 119th Cong. (2026) (emphasis added)).

- A prohibition on "elected officials of the federal government, employees of the House and Senate, political appointees, and executive employees from purchasing, selling, or exchanging 'prediction market contracts' related to government policy, government action, or a political outcome if they possess relevant material nonpublic information (MNPI) or may reasonably obtain such information in the course of performing official duties." *Id.* (quoting Public Integrity in Financial Prediction Markets Act of 2026, H.R. 7004, 119th Cong. (2026)).

- A prohibition on "the President, Vice President, Members of Congress, House and Senate employees, political appointees, and employees of executive or independent regulatory agencies [from] us[ing] MNPI derived from their position or gained from the performance of their official responsibilities as a means for profiting from a prediction market transaction." *Id.* (citing Public Integrity in Financial Prediction Markets Act of 2026, S. 4188, 119th Cong. (2026)).

- A prohibition on certain government employees "from trading on prediction market contracts dependent on a 'specific political event.'" *Id.* (quoting PREDICT Act, H.R. 8076, 119th Cong. (2026)).

- A prohibition on "senior executive branch officials from trading in event contracts related to any matters in which the official personally and substantially participates as a government officer or employee." *Id.* (quoting End Prediction Market Corruption Act, S. 4017, 119th Cong. (2026)).

None of these would be necessary if the CEA already prohibited this conduct. And Congress's concern about whether the "*primary underlying characteristic*" of these so-called events contracts is *financial*—or, as here, *not financial*—confirms Van Dyke's reading of the current statutory text. *Id.* (quoting BETS OFF Act, S. 4115, 119th Cong. (2026) (emphasis added)).

*3. The Contracts Are Not "Swaps" Because Of How Payment Is Resolved*

Even if this Court concludes that certain prediction market wagers could be considered "events" "associated with a potential financial, economic, or commercial consequence" within the meaning of 7 U.S.C. § 1a(47)(A)(ii), the CEA counts fail for an independent reason: the contracts do not satisfy the statute's separate and distinct requirement that payment be "dependent on the

occurrence, nonoccurrence, or the extent of the occurrence" of that event. That requirement demands a specific causal architecture—payment must track the real-world event itself, ascertained through an objective, non-discretionary mechanism like an underlying index, a specific price that is ascertainable by all on a marketplace, or some type of official data. The wagers listed in the indictment fail even that test because the contracts, by their own terms, sometimes require dispute resolution, and if there is a dispute, Polymarket relies on the collective judgment of interested parties as the operative trigger of payment.

The event contracts that Congress and the CFTC have actually treated as swaps share a common structural feature totally absent here: an outcome is measured against a metric external to and independent of the parties charged with declaring the result. For example, a weather swap may settle against temperature data recorded by the National Weather Service and aggregated by an independent data processor with no stake in the outcome. An interest-rate swap may settle based on published Secured Overnight Financing Rates. A commodity swap may settle on the price of a specific item on an exchange. But Polymarket's contracts break sharply from this pattern. Payment is contingent not on the underlying event the contract references—as it would be with any "swap" properly regulated under the CEA—but on whatever terms the contracts provide. The at-issue trades turned on "a consensus of credible reporting" regarding the scenarios posited by the contract. Polymarket thus uses subjective and deliberative judgment by interested market participants as the operative mechanism by which contracts are settled—as opposed to objective ascertainment of fact or reference index. Every previously regulated "swap" and event contract has required such features.

Congress did not define "swap" to include wagers on what a group of self-interested bettors will later agree happened; it defined "swap" to include payments keyed to whether something did

or did not, in fact, occur. The statutory language "[d]ependent on the occurrence... of an event" is not surplusage; it requires an actual causal linkage between the real-world event and the payment obligation. Here, that requirement is absent.

#### 4. *If Ambiguity Exists, the Rule of Lenity Applies*

Even if the government's reading of "swap" were not foreclosed by the statute's text, structure, and legislative history, any residual ambiguity must be resolved in Van Dyke's favor. The rule of lenity is a safeguard that applies whenever there is "grievous ambiguity or uncertainty" in a criminal statute's coverage. *Chapman v. United States*, 500 U.S. 453, 463 (1991). Courts have "never held that the Government's reading of a criminal statute is entitled to any deference," *Abramski v. United States*, 573 U.S. 169, 191 (2014), and where "the governing standard is set forth in a criminal statute, it is appropriate to apply the rule of lenity," *Crandon v. United States*, 494 U.S. 152, 158 (1990). This independently forecloses the government's boundless interpretation of "swap" and requires dismissal of the three CEA counts.

### B. Constitutional Principles Require Dismissal

The Government has made clear it intends to use this unprecedented case—the first-ever prosecution alleging misuse of government information under Dodd-Frank involving prediction market wagers—to establish a deterrent in an innovative industry. Months before the indictment, Former U.S. Attorney Jay Clayton publicly stated prediction markets were "an area that [he was] looking at," adding he expected enforcement in that area.[10] After Van Dyke's indictment, he stated "[p]rediction markets are not a haven for using misappropriated confidential or classified

---

[10] SDNY Chief Says Office Has Eye On Prediction Markets (Feb. 5, 2026), https://www.law360.com/securities/articles/2438607

information for personal gain."[11] But the statutes the government has chosen to wield—the CEA's insider trading provisions and Rule 180.1's misappropriation framework—were developed for traditional, exchange-traded commodity markets and have never been applied to a decentralized, blockchain-settled prediction platform whose classification as a "swap" market has itself never been tested in a criminal case.

The government's desire to use the criminal law to establish a deterrent in a new industry does not relieve it of its constitutional Due Process obligations. Conduct is not criminal absent a clear statute that provides fair notice of the forbidden conduct. Where, as here, the government stretches long-settled statutory frameworks beyond fair interpretation to reach novel conduct, dismissal is required.

*1. The Constitution Requires that Criminal Statutes be Clear and Definite*

The Fifth Amendment to the U.S. Constitution prohibits depriving a person of liberty "without due process of law." U.S. Const. amend. V. The Government violates the Due Process clause when it "tak[es] away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). This "prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law.'" *Id.* at 595–96 (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).

This constitutional guarantee counsels strict construction of penal laws because "[i]t is the legislature, not the Court, which is to define a crime, and ordain its punishment." *United States v.*

[11] "U.S. Soldier Charged with Using Classified Information to Profit from Prediction Market Bets," Department of Justice (Apr. 23, 2026), https://www.justice.gov/opa/pr/us-soldier-charged-using-classified-information-profit-prediction-market-bets

*Wiltberger*, 18 U.S. 76, 95 (1820); *see also United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 490 (2001) ("federal crimes are defined by statute rather than by common law"); *Lewis v. United States*, 523 U.S. 155, 160 (1998) (same). Courts lack the "power to define new federal crimes" because it deprives citizens of "fair notice of what is prohibited." *Skilling v. United States*, 561 U.S. 358, 415–416 (2010) (Scalia, J., concurring in part and concurring in the judgment) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

The prohibition against court-defined law is encompassed in the "void-for-vagueness doctrine," which ensures that citizens have fair notice of criminal conduct and are protected from arbitrary enforcement. The Supreme Court has held:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

*Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972); *see also United States v. Davis*, 588 U.S. 445, 451 (2019) ("Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide."). In other words, "[t]he Constitution does not permit a legislature to set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999).

A statute violates the void-for-vagueness doctrine if "some element of the statute turns on the law enforcement officer's unguided and subjective judgment." *Copeland v. Vance*, 893 F.3d 101, 120 (2d Cir. 2018). The doctrine thus requires "that a legislature establish minimal guidelines

to govern law enforcement" so that criminal statutes do not permit "'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Skilling*, 561 U.S. at 415-416 (Scalia, J., concurring).

Courts may not re-write an unconstitutionally vague statute to salvage it. *Skilling*, 561 U.S. at 415, 413-24 (Scalia, J, concurring in part and concurring in the judgment). However, they may sometimes save a statute that would otherwise be void for vagueness by interpreting it narrowly. *Id.* at 405 (opinion of the Court) ("It has long been our practice, before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction."). This applies with greater force in the criminal context, where courts have a lower tolerance because "the consequences of imprecision are qualitatively [more] severe" than those of vague civil laws. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982)); *Arriaga v. Mukasey*, 521 F.3d 219, 222–23 (2d Cir. 2008) (criminal laws challenged as vague receive "close scrutiny").

2. *The CEA Count Must be Dismissed Because the CEA Fails to Give Fair Notice That Geopolitical Events Wagers Are Swaps*

There is inherent vagueness in 7 U.S.C. § 1a(47)(A)(ii)'s requirement that contracts be "associated with a potential financial, economic, or commercial consequence." As explained above, the text cannot—and does not—reach *all* contracts that include an event contingency having any potential downstream economic effect. *See supra* Section IV.A. The interpretation that reaches Van Dyke's conduct is so open-ended that virtually any wager on any event could be recharacterized as a regulated derivative. Yet the statutory definition lacks limiting language that clearly delineates the "boundaries of the forbidden areas." *Grayned*, 408 U.S. at 108-09. This indefiniteness invites law enforcement's "unguided and subjective judgment" to pick and chose

which wagers constitute swaps and charge individuals based on their personal beliefs about public policy. *Copeland*, 893 F.3d at 120.

The same is true for Subpart (iv)'s provision defining a "swap" as any contract that "is, or in the future becomes, commonly known to the trade as a swap." Who decides when an innovative product becomes "commonly known to the trade" as a swap and therefore subject to CEA prohibitions? The statute offers no guidance. Instead, it impermissibly sets "a net large enough to catch all possible offenders" and leaves to prosecutors "who could be rightfully detained." *Morales*, 527 U.S. at 60. This is particularly so regarding the "in the future becomes" language – when in the future? Who decides?

Van Dyke was charged in response to media reporting and public outcry about prediction market unfairness. But conduct does not become a crime simply because certain people don't like it. If the government does not want people to use confidential government information to engage in prediction markets trading, the solution is "legislative." *Wiltberger*, 18 U.S. at 95.

Like other vague statutes, the CEA fails to provide "ordinary people fair notice" of the conduct it prohibits. *Johnson*, 576 U.S. at 595. The government's own proposed legislation and rulemaking highlight the inherent unfairness in prosecuting Van Dyke based on this novel, overbroad application of the CEA. As summarized above, Congress has proposed 12 new items of legislation targeting prediction market trading. *See supra* Section IV.A.2. Congress itself has doubts as to whether the CEA's current prohibitions reach such conduct—how are "ordinary people" to formulate any clearer understanding of what conduct the statute reaches? They cannot.

The CFTC and SEC also both acknowledge that the CEA's "swap" definition fails to clearly regulate events trading. That alone should end this matter. On June 18, 2025, the Commissions requested "public comment on potential ways to draw clearer regulatory lines with respect to

innovative products that may implicate both SEC and CFTC regulatory interests."[12] The Commissions stated that "market participants are raising questions about whether certain event contracts are swaps, SBS, or mixed swaps, or types of instruments that fall within statutory exclusions from the 'swap" definition." *Id.* The Commissions asked market participants, "In the context of these innovations, is additional clarification necessary to provide principled, objective criteria for distinguishing between swaps, mixed swaps, SBS, or other securities or instruments that are excluded from the definition of 'swap'?" *Id.* These questions indicate that prediction market trades are *not* "commonly known" as swaps and that market participants do not have fair notice about whether the CEA regulates events betting. 7 U.S.C. § 1a(47)(A)(iv).

The CFTC and SEC repeated the same concerns in a Joint Statement on September 5, 2025.[13] Specifically identifying "event contracts" as raising regulatory doubts, the statement noted that these agencies "should work together to provide clarity."

Courts are also split. In the Sixth Circuit, two courts have held sports-events contracts do not constitute swaps, while one has held they do. *Compare Schuler*, 2026 WL 657004, *and QCX LLC*, 2026 WL 1166362, *with Kalshiex LLC v. Orgel*, No. 26 Civ. 00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026). In the Ninth Circuit, three courts have concluded sports-events contracts are not swaps, while one court has concluded event contracts traded on designated contract markets (DCMs) are swaps. *Compare N. Am. Derivatives Exch., Inc.*, 815 F. Supp. 3d 1169, *Hendrick*, 817

---

[12] Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance, 91 Fed. Reg. 37873 (proposed June 18, 2026), https://www.regulations.gov/document/CFTC-2026-1321-0001.

[13] Joint Statement from the Chairman of the SEC and Acting Chairman of the CFTC Chairman Paul S. Atkins, U.S. Securities and Exchange Commission, and Acting Chairman Caroline D. Pham, U.S. Commodity Futures Trading Commission (Sept. 5, 2025) available at https://www.sec.gov/newsroom/speeches-statements/joint-statement-atkins-pham-090525

F. Supp. 3d 1014, *and Robinhood Derivatives, LLC*, 2025 WL 3283308, *with KalshiEX LLC v. Johnson*, No. 26 Civ. 01715, 2026 WL 1223373 (D. Ariz. May 5, 2026).

If Congress, executive branch agencies, and courts all find the "swap" definition ambiguous, how can ordinary citizens have fair notice that prediction market wagers are covered by the CEA? They cannot.

Uneven enforcement in an emerging area further muddies the issue of fair notice and evidences unconstitutionally "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108-09. When the government prosecutes a single soldier while leaving the vast majority of similar conduct untouched, the result is a patchwork of arbitrary enforcement that both evidences and compounds the fair notice problem.

*3. The Insider Trading Alleged in Count Three is An Unconstitutional Federal Common-Law Crime*

a. Neither 7 U.S.C. § 9(1) Nor Rule 180.1 Prohibit Insider Trading

Neither Section 6(c)(1) of the CEA nor CFTC Rule 180.1 expressly prohibit insider trading, much less mention trading on the basis of confidential information. *See* 7 U.S.C. § 9(1); 17 C.F.R. § 180.1. Instead, CEA Section (6)(c)(1) simply mirrors the exact language of Section 10(b) of the Securities Exchange Act. Though the Congress directed the CFTC to define the prohibited conduct, the CFTC, "[g]iven the similarities between CEA 6(c)(1) and Exchange Act 10(b)," merely "model[led] final Rule 180.1 on SEC Rule 10b-5" without describing what constitutes "any device, scheme or artifice to defraud" or "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 76 Fed. Reg. 41,398, 41,399 (July 14, 2011); 17 C.F.R. § 180.1(a)(1), (3). Indeed, "Section 6(c)(1) and Rule 180.1(a) are, respectively, carbon copies of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated by the Securities and Exchange Commission." *CFTC v. Gorman*, 587 F. Supp. 3d 24, 40 (S.D.N.Y. 2022);

*see also United States v. Clark*, 2025 WL 801358, *3 (5th Cir. Mar. 13, 2025) ("The operative language in 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 is an exact transplant from section 10(b)-5 of the Securities Exchange Act.").

In formulating Rule 180.1, the CFTC determined that "section 6(c)(1) is a broad catch-all provision, reaching any manipulative or deceptive device or contrivance." 76 Fed. Reg. 41,398, 41,403 (July 14, 2011). By design, then, Rule 180.1 does not define what conduct it prohibits. Instead, it simply replicates the broad statutory language of Section 6(c)(1) and leaves the question of scope entirely to courts. This is precisely the problem. The CFTC's rule, promulgated in contravention of Congress's directive to define the conduct prohibited by Section 6(c)(1), allows the government to arbitrarily prosecute any conduct as a violation and leaves it to courts to resolve the ambiguity. Not only does this violate fair notice principles (*see supra* Section IV.B.1-2), it, in effect, impermissibly redelegates rulemaking to the courts by leaving the statute and rule entirely open to judicial interpretation.

The indictment suggests that the government intends to ask the Court to apply insider trading common law, developed in the Section 10(b) and Rule 10b-5 context, to its interpretation of Section 6(c)(1) and Rule 180.1. But insider trading theory was constructed on a case-by-case basis under the securities laws, culminating in the misappropriation theory recognized in *United States v. O'Hagan*, 521 U.S. 642 (1997). Indeed, the Supreme Court has acknowledged that Section 10(b) and Rule 10b-5 liability is "a judicial oak which has grown from little more than a legislative acorn." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737 (1975); *see also Chiarella v. United States*, 445 U.S. 222 (1980) ("administrative and judicial interpretations," rather than statutory or regulatory text, "established that silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b)"). Extending that judicially

constructed body of law to a distinct criminal statute—Section 6(c)(1)—would create a new federal common-law crime in violation of separation-of-powers principles. *See United States v. Lanier*, 520 U.S. 259, 267 n.6 (1997) ("Federal crimes are defined by Congress, not the courts."); *Welch v. United States*, 136 S. Ct. 1257, 1268 (2016) ("[O]nly Congress, and not the courts . . . can make conduct criminal.") (internal citation omitted).

Though there is substantial common law outlining the contours of criminal insider trading under Section 10(b) and Rule 10b-5, little exists for Section 6(c)(1), enacted in 2008, and Rule 180.1, promulgated in 2011. Few courts have analyzed Section 6(c)(1) in the criminal law context due to a dearth of insider trading prosecutions relating to commodities trading. [14] The courts that have analyzed Section 6(c)(1) and Rule 180.1, almost entirely in civil cases, have imported Section 10(b) and Rule 10b-5 precedent wholesale. *See, e.g.*, *CFTC v. EOX Holdings, LLC*, 405 F. Supp. 3d 697, 713-716 (S.D. Tex. 2019) (denying motion to dismiss and applying Section 10(b) misappropriation theory to alleged insider trading under Section 6(c)(1)).

Here, the Court should, consistent with fair notice principles, decline to further expand federal criminal common law by extending the reach of Section 6(c)(1) beyond its clear statutory language.

b. The Legislative Ambiguity in CEA Section 6(c)(1) Purportedly Filled by Rule 180.1 Is Not Entitled to Deference

The Commission's view that Section 6(c)(1) and its implementing rule reach insider trading is an agency position entitled to no more weight than its power to persuade. "Courts must exercise

[14] Counsel has identified only one prior insider trading scheme charged under Section 6(c)(1). In *United States v. Schultz*, No. 20 Cr. 270 (S.D. Tex.), the defendants pleaded guilty to an information without challenging the legitimacy of the government's insider trading theory. One alleged co-conspirator pleaded guilty after indictment. *See United States v. Miller*, No. 21 Cr. 570 (S.D. Tex). One alleged co-conspirator appealed his conviction after entering a guilty plea. *United States v. Clark*, No. 24-20271, 2025 WL 801358 (5th Cir. 2025) (affirming conviction of Section 6(c)(1) and Rule 180.1 violations based on Section 10(b) precedent).

their independent judgment in deciding whether an agency has acted within its statutory authority" and "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) (holding that). That is doubly true here because § 6(c)(1) carries criminal penalties. Even before *Loper*, the Court had "never held that the Government's reading of a criminal statute is entitled to any deference," *Abramski*, 573 U.S. at 191, and had made clear that when "the governing standard is set forth in a criminal statute, it is appropriate to apply the rule of lenity," *Crandon*, 494 U.S. at 158.

The statutory text of Section 6(c)(1)—identical to Securities Exchange Act Section 10(b)—does not reach insider trading. *See, e.g.*, *United States v. Newman*, 773 F.3d 438, 445 (2d Cir. 2014) ("neither [section 10(b)] nor the regulations issued pursuant to it, including Rule 10b-5, expressly prohibit insider trading"), *abrogated on other grounds by Salman v. United States*, 580 U.S. 39 (2016). An interpretation of Section 6(c)(1) that reaches insider trading depends on importing the common law developed under Section 10(b), a move accomplished not by Congress but by the Commission's 2011 adopting release of Rule 180.1, which announced that the agency would be "guided, but not controlled," by Rule 10b-5 precedent. *See* 76 Fed. Reg. 41,398, 41,405 (July 14, 2011). But an agency cannot enlarge the reach of a criminal statute by regulation or interpretive gloss. *See, e.g.*, *Garland v. Cargill*, 602 U.S. 406 (2024); *Whitman v. United States*, 574 U.S. 1003, 1004-05 (2014) (Scalia, J., opinion denying certiorari).

Whatever an adopting release may say, it cannot supply the criminal prohibition that Section 6(c)(1)'s text withholds. *Cargill*, 602 U.S. at 428 (agency rule unlawfully expanded definition beyond the meaning encompassed in the statutory text); *United States v. Apel*, 571 U.S. 359 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled

to any deference."). Post-*Loper*, the Court's clear duty is to construe *the statute*, not the common law the securities bar has generated, nor the CFTC's interpretive preferences.

### C. Subpart (iv) of the Swap Definition Does Not Apply For Two Independent Reasons

7 U.S.C. § 1a(47)(a)(iv) defines "swap" to include "an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap." This provision is breathtakingly broad, and cannot serve as a basis for criminal liability for two different reasons.

*First*, as evidenced by recent litigation in this area, and the recent CFTC rulemaking discussed *supra*, the alleged trades are not and have never been "commonly known" as swaps.[15] The opposite is true. Such betting has historically been—and is still widely considered—gambling. Only recently have prediction market platforms themselves taken the position that these trades are swaps. That position is self-serving: By bringing their products within the CFTC's regulatory framework, the prediction market platforms can argue that CFTC jurisdiction preempts restrictive state gaming and gambling laws and broaden their offerings. This is good for their business.

*Second*, subpart (iv) also violates the Constitution's Ex Post Facto Clause, which forbids "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." *Calder v. Bull*, 3 U.S. 386, 390 (1798); *accord Peugh v. United States*, 569 U.S. 530, 538-39 (2013). Its purpose is to "assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981).

[15] The recent legislation and proposed rulemaking in this area shows the same. *See infra* Section IV.A.2.

These fair warning principles constrain after-the-fact constructions of a criminal statute. Although the Ex Post Facto Clause "is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government," the Supreme Court has held that "limitations on *ex post facto* judicial decision making are inherent in the notion of due process." *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001) (quoting *Marks v. United States*, 430 U.S. 188, 191 (1977)). This is because "[d]eprivation of the right to fair warning … can result both from vague statutory language and from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face." *Id.* at 457 (citing *Bouie v. City of Columbia*, 378 U.S. 347 (1964)). Therefore, "[i]f a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' [the construction] must not be given retroactive effect." *Id.* (quoting *Bouie*, 378 U.S. at 354).

Subpart (iv) invites a violation of the Ex Post Facto Clause and cannot be applied here. The phrasing—"is, or in the future becomes, commonly known"—is subject to a moving target determined by an undefined private industry ("the trade"). The statute thus invites unconstitutional retroactive application because the parameters of the regulated conduct may expand indefinitely, without additional legislation, leaving individuals unable to "rely on [the definition's] meaning until it is explicitly changed." *Weaver*, 450 U.S. at 28-29. Instead, it permits prosecutors and courts to decide whether certain conduct fits the moving target after the fact. This is expressly what the Ex Post Facto Clause forbids.

## V. <u>**Count Four Must Be Dismissed**</u>

The Court should separately dismiss the Wire Fraud charge in Count Four because the count rests on the government's erroneous theory that the military's purportedly confidential plans for a forthcoming military operation constitute "property." That position is an impermissible extension of the Supreme Court's *Carpenter* decision, as analogous cases have held, and conflicts

with binding precedent holding that schemes related to the government's sovereign powers fall outside the bounds of the fraud statutes.

Moreover, the government's "property" theory has already been squarely rejected by Second Circuit precedent, which holds that confidential information cannot be "property" under the fraud statutes unless it has commercial value to the entity that possesses it. Indeed, the very same government prosecuting Van Dyke has recently proclaimed that "it is now the position of the Department of Justice that in a case involving confidential government information, that information typically must have economic value in the hands of the relevant government entity to constitute 'property' for purposes of 18 U.S.C. §[]1343." The information in the indictment plainly fails that standard, notwithstanding the government's rote recitation of "pecuniary value" in Count Four. Finally, the indictment further fails to allege the required specific intent to defraud the government of its "property."

These legal deficiencies are clear on the face of the indictment and incurable on the facts alleged.

### A. The Fraud Statutes' "Property" Requirement

The wire fraud statute prohibits using interstate wires for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. Although phrased in the disjunctive, the statute only criminalizes schemes to "obtain[] money or property."[16] *Ciminelli v. United States*, 598 U.S. 306, 312 (2023); *Kelly v. United States*, 590 U.S. 391, 398 (2020) (government "need[s] to prove *property* fraud"). The "property" requirement is a central feature of the statute and carries a narrow

[16] The government does not allege Van Dyke schemed to defraud the government of its "money." Nor could it. The charging theory is that he schemed to defraud the government of its "property" in the form of confidential information. We therefore focus on the "property" requirement.

meaning developed over years of jurisprudence that the government's theory simply ignores. We begin by outlining this history, which makes clear that the fraud statutes protect only "traditional" property interests wholly absent from this case.

*1. The Supreme Court's* McNally *and* Carpenter *Decisions*

Beginning with *McNally v. United States*, the Supreme Court held that the mail fraud statute is "limited in scope to the protection of property rights." 483 U.S. 350, 360 (1987).[17] As the Court later explained, "[a]t the time *McNally* was decided, federal prosecutors had been using [the statute] to attack various forms of corruption that deprived victims of 'intangible rights' unrelated to money or property," such as the intangible right to honest government services. *Cleveland v. United States*, 531 U.S. 12, 18 (2000). *McNally* "stopped the development of the intangible-rights doctrine in its tracks" and required prosecutors to honor the statute's property limitation. *Skilling v. United States*, 561 U.S. 358, 401 (2010).

In *Carpenter v. United States*, the Supreme Court considered whether "property" could include intangible confidential business information. 484 U.S. 19 (1987). There, a Wall Street Journal employee orchestrated a securities trading scheme using the pre-publication contents of a market-moving Journal column, "Heard on the Street." Relying on historical cases, statutes, and legal treatises concerning trade secrets law and other intangible forms of property protected at common law, the Supreme Court held that this pre-publication information was the Journal's "property." It stated: "Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit." *Id.* at 26 (quoting 3 W. Fletcher, Cyclopedia of Law of Private

[17] While Count Four charges wire fraud in violation of 18 U.S.C. § 1343, the term "property" in the mail fraud statute, *see* 18 U.S.C. § 1341, is construed "*in pari materia.*" *Ciminelli v. United States*, 598 U.S. 306, 312 (2023).

Corporations § 857.1, p. 260 (rev. ed. 1986)). Specifically, the "Journal had a property right in keeping confidential and making exclusive use, prior to publication," of its column, because "[n]ews matter … is stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money for it, as for any other merchandise." *Carpenter*, 484 U.S. at 26 (quoting *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 236 (1918)). That historical pedigree distinguished the newspaper's confidential pre-publication contents from the purported property interest in *McNally*, which the Court described as the "ethereal" right to the "honest and faithful service" of a government employee. *Id*. at 25.

The principles identified in *Carpenter* made it a straightforward case. *Carpenter* was about a newspaper—a business where information *is the product*. The confidential business information was thus the employer's "property" because it was the very product it sold. But the fact that confidential business information is *sometimes* property does not mean that confidential information is *always* property. The government's wire fraud theory fails to grasp this basic point.

The Court has since made clear that *Carpenter* concerned a limited class of "proprietary information." *Kousisis v. United States*, 605 U.S. 114, 132 (2025). Moreover, it has reiterated the statutory term "property" is not a "catchall." *Id.* at 121. For example, it has rejected attempts to "treat[] mere information as the protected interest" in wire fraud prosecutions—even "potentially valuable economic information" "necessary to make discretionary economic decisions." *Ciminelli*, 598 U.S. at 309, 314-15. Instead, the term "property" must be interpreted narrowly, particularly when it concerns intangibles like information. The fraud statutes are thus construed consistent with fraud's "well-settled meaning at common law," *Neder v. United States*, 527 U.S. 1, 22 (1999), such that the term "property" covers only "interest[s] that 'ha[ve] long been recognized as property,'" and "traditional concepts of property," *Cleveland*, 531 U.S. at 23-24

(quoting *Carpenter*, 484 U.S. at 26). *See also Ciminelli*, 598 U.S. at 314 (summarizing same); *Kousisis*, 605 U.S. at 122 (same).

### *2.* Cleveland*,* Kelly*,* Blaszczak*, and* Chastain *Further Limit the Scope of "Property"*

The Supreme Court and the Second Circuit have not extended *Carpenter* to purportedly confidential information held by a government entity. To the contrary, in a series of decisions further limiting the scope of the fraud statutes, these courts have reiterated that because the wire fraud statute "protect[s] individual property rights" only, "any benefit which the Government derives from the statute must be limited to the Government's interests as property holder"—including in confidential information cases. *McNally*, 483 U.S. at 359 n.8.

Starting with *Cleveland*, the Supreme Court ruled that a state gaming license is not "property" under the federal fraud statutes and therefore lying to obtain such a license is not federal fraud. 531 U.S. at 15. The Court began with the premise that to prove a scheme to defraud the government of "property," the prosecution must show that "the thing obtained" is "property in the hands of the [government]." *Cleveland*, 531 U.S. at 15. The Court then reasoned that (1) the licenses themselves had no economic value until they were issued to a private actor; and (2) the state government's "core concern" in licensing was "regulatory," not economic, because its licensing decisions "implicate the government's role as sovereign, not as property holder." *Id*. at 22-24. The Court explained that the government's "intangible rights of allocation, exclusion, and control" regarding licensing "amount to no more and no less than [the State's] power to regulate," and thus do not create a property interest. *Id.* at 23. In so holding, the Court again emphasized that the fraud statutes must not "stray from traditional concepts of property," *id.* at 24, and narrowly construed "property" to restrain government overreach through novel prosecution theories.

In *Kelly*, the Supreme Court reversed the wire fraud convictions of two former government officials who allegedly schemed to realign toll lanes on the George Washington Bridge to punish the mayor of Fort Lee, New Jersey. 590 U.S. 391. In so doing, the Court held that a "scheme to reallocate the [George Washington] Bridge's access lanes" did not constitute property fraud under 18 U.S.C. § 1343. *Id.* at 403. The Court again focused on whether the object of the scheme implicated the "Government's role as sovereign wielding traditional police powers," as opposed to "its role as property holder." *Id.* at 400-01 (cleaned up). Relying heavily on *Cleveland*, the Court concluded that the object of the fraud—the "lane realignment" by the Port Authority—was an "exercise of regulatory power" rather than "the taking of property." *Id*. at 400-02. But moving one step beyond its finding in *Cleveland*, the Court also held that the government could not support a wire fraud conviction by relying on an incidental property right implicated by the realignment scheme, such as an affected toll booth worker's time or labor and associated costs. *Id*. at 401-03. As specifically noted by the Court, "property must play more than some bit part in a scheme: It must be an object of the fraud." *Id*. at 402 (internal citations omitted).

Shortly before *Kelly* was decided, in *United States v. Blaszczak*, the Second Circuit considered whether confidential government agency information could be considered "property." 947 F.3d 19 (2d Cir. 2019) (*Blaszczak I*). The defendants in that case were charged with misappropriating nonpublic information from the Centers for Medicare & Medicaid Services ("CMS") about a forthcoming agency rule. The indictment principally alleged that CMS employees disclosed the agency's plans to a "political intelligence" consultant for hedge funds, who in turn tipped the information to employees of a healthcare-focused hedge fund, which traded on it. Distinguishing *Cleveland* and citing *Carpenter*, the Second Circuit originally held—over a dissent—that "[i]n stark contrast to a state's right to issue or deny a poker license … CMS's right

to exclude the public from accessing its confidential predecisional information squarely implicates the government's role as property holder, not as sovereign." *Blaszczak I*, 947 F.3d at 33.

That was not the end of the case. The *Blaszczak* defendants filed petitions for writs of certiorari arguing, *inter alia*, that information about a proposed government regulation is not "property" under 18 U.S.C. § 1343. Notably, the Acting Solicitor General requested the Supreme Court grant the petitions, vacate *Blaszczak I*, and remand the case for further consideration in light of *Kelly*—which the Supreme Court did. On remand, the Second Circuit reversed course. *See United States v. Blaszczak*, 56 F.4th 230, 243-44 (2d Cir. 2022) (*Blaszczak II*). The court held the "confidential information" was not "property," because an agency "is not a commercial entity" and "does not sell, or offer for sale, a service or a product," such that "premature[] disclos[ure] ... has no direct impact on the government's fisc." *Id*. The Court expressly contrasted the agency's confidential information with the "property of a commercial entity such as the publisher victim in *Carpenter*," which was its "'stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and *to be distributed and sold to those who would pay money for it*'"—emphasizing that the *Carpenter* information was sold to the victim's customers. *Id*. (quoting *Carpenter*, 484 U.S. at 26, emphasis in *Blaszczak II*). *Blaszczak II* thus identified an essential characteristic necessary to prove an entity (including a government entity) has a "traditional property interest" in information—the information must have commercial value to that entity.

The Second Circuit's *United States v. Chastain* decision further resolved any doubts as to what features confidential information must have to qualify as a victim's "property"—this time in a non-government-information case. 145 F.4th 282 (2d Cir. 2025). There, the defendant was employed by a company that offered an online marketplace for NFTs. As head of product, the defendant was responsible for selecting the NFTs the company would feature on its website. When

an NFT was featured, its value increased. The defendant purchased NFTs before they were featured and sold them afterward for a profit. At trial, the district court instructed the jury "that the government did not need to show that [the company] had a commercial interest in the featured NFT information as long as the information was 'acquired or created by [the company] for a business purpose' and [the company] 'both considered and treated that information in a way that maintained the company's exclusive right to that information.'" *Chastain*, 145 F.4th at 295. The Second Circuit found the instruction erroneous and vacated the conviction. It held that, "[i]n each of the examples" cited by *Carpenter*, "the information had commercial value to the company." *Chastain*, 145 F.4th at 293. Thus, "[i]nformation that lacks commercial value has not been … recognized" as "property." *Id.* at 294. Stated differently, "confidential information does not qualify as a traditional property interest unless it has commercial value to the company that holds it." *Id.* at 295.

#### 3. *The DOJ Made Its Post-*Kelly *Position On "Property" Clear: Government Information Must Have Commercial Value to the Government to Qualify as "Property"*

None of the above should surprise the government because the holdings in *Blaszczak II* and *Chastain* reflect the very position the Solicitor General's Office instructed the government to take in the wake of *Kelly*.

For example, on remand from the Supreme Court in *Blaszczak II*, the United States Attorney's Office—at the direction of the Solicitor General's Office—confessed error and wrote to clarify "the Department of Justice's post-*Kelly* position on the scope of 'property' under 18 U.S.C. §[]1343." U.S. Remand Brief at 2, *United States v. Blaszczak*, Nos. 18-2811, 18-2825, 18-2867, 18-2878 (2d Cir. April 2, 2021) (ECF No. 453). The government said that "[i]n light of the Supreme Court's holding in *Kelly*, it is now the position of the Department of Justice that in a case

involving confidential government information, that information typically must have *economic value in the hands of the relevant government entity* to constitute 'property' for purposes of 18 U.S.C. §[]1343." *Id.* at 7-8 (emphasis added). It further said that to constitute "property," information must have "inherent market value" to its "owners." U.S. Supp. Letter Brief at 7, *United States v. Blaszczak*, Nos. 18-2811, 18-2825, 18-2867, 18-2878 (2d Cir. June 4, 2021) (ECF No. 497).

The government also noted that a scheme "to obtain confidential agency information about upcoming regulatory decisions … can no longer be considered a scheme that targets 'property.'" *Id.* at 1. It explained that "[u]nlike confidential business information, which is closely related to traditional forms of property such as trade secrets and copyrighted news matter, *see Carpenter*, 484 U.S. at 26, confidential regulatory information does not bear any direct connection to 'traditional concepts of property,' *Cleveland*, 531 U.S. at 24." *Id.* at 5-6. In other words, confidential information that is "governmental in nature and has no private analogue" is not "property." *Id.* at 7. What could be more on point in this case?

The government took the same position in *United States v. Middendorf*, No. 19-2983 (2d Cir.) and *United States v. Aytes*, No. 19-3981 (2d Cir.)—two other recent appeals involving the misappropriation of confidential government information. The *Middendorf* charges arose from a multi-year scheme carried out by a KPMG accounting executive, an inspections leader with the Public Company Accounting Oversight Board (the "PCAOB"), and others to defraud the PCAOB by embezzling valuable confidential information regarding PCAOB inspection plans so that KPMG could use the information to its advantage in the PCAOB inspection process. After conviction and during the defendants' appeal, the government moved in the Second Circuit to remand the case for dismissal before the district court, citing the same post-*Kelly* position

regarding the scope of "property." *See* U.S. Mot. to Remand, *United States v. Middendorf*, No. 19-2983 (2d Cir.) (ECF No. 242). And in *Aytes*, the defendant was found guilty of the unauthorized taking from the FDIC of paper and electronic copies of documents that detailed plans, in the event of a severe financial crisis, for the rapid and orderly liquidation of four banks regulated by the FDIC. Another U.S. Attorney's Office, again after consulting with the Solicitor General's Office, confessed error given *Kelly* and sought dismissal. *See Blaszczak II*, 56 F.4th at 241-42 (describing *Aytes*); U.S. Mot. to Dismiss, *Unites States v. Aytes*, No. 19-3981 (2d Cir. Apr. 12, 2021) (ECF No. 65).

These representations continued during the *Chastain* appeal, where the government again admitted that "[i]n a case involving government information, a court can helpfully look at whether the value of information to the government is primarily regulatory or economic." U.S. Brief at 21, n.4, *United States v. Chastain*, No. 23-7038 (2d Cir. April 16, 2024) (ECF No. 38). When information is not primarily economic in nature, it is not "property." The government further indicated that when "[g]overnments, unlike private businesses…, [] act through their 'sovereign power[s]…,' rather than in their capacity as market participants," schemes implicating those powers do not constitute fraud. *Id.* at 20 (quoting *Kelly*, 590 U.S. at 401).

**B. Information About Military Plans Is Not "Property"**

The result of the precedent discussed above and the government's admissions concerning that precedent should be clear enough: information about the military's plans to engage in an operation to capture a foreign head of state is simply not "property." No court has ever held as much, and as far as we are aware neither the Supreme Court nor the Second Circuit—except for the vacated *Blaszczak I* decision—has ever even extended *Carpenter* to purportedly confidential information held by a government entity. That alone is enough to resolve this case, as the

information alleged in the indictment is not a "traditional property interest[.]" *Kousisis*, 605 U.S. at 122.

Even if *Carpenter* could be extended to purportedly confidential information held by a government entity, the information at issue does not clear the remaining hurdles established by *Cleveland*, *Kelly*, *Blaszczak II*, and *Chastain*. Information cannot qualify as government "property" unless it has commercial value to the government in its capacity "as property holder." *Kelly*, 590 U.S. at 400-01. The information cannot merely be created or maintained by the government in its capacity as a "sovereign wielding," for example, "traditional police powers." *Id.* at 401 (cleaned up). The information must be "primarily . . . economic," akin to when the government acts in its "capacity as market participant[.]" U.S. Brief at 21, n.4, 20, *Chastain* (ECF No. 38). But here, the government's "core concern" regarding the information was not economic or commercial at all but related only to its "sovereign" military function. *Id.*; *see United States v. Evans*, 844 F.2d 36, 40-42 (2d Cir. 1988) (conducting traditional property inquiry and rejecting theory that government had a property interest in preventing resale of weapons because its interest was "ancillary to a regulation, not to property"). That is even clear from the indictment, which states that such information is kept confidential "to protect national security interests and future operations," not so that the government can engage in commerce. Indictment ¶ 6.

Indeed, it is hard to imagine a function more sovereign and less commercial than the United States military function. "[T]he management and deployment of military personnel" are "quintessential sovereign functions." *Koudou v. Permanent Mission of Cote D'ivoire to United Nations in New York*, 2026 WL 915287, at *3 (S.D.N.Y. Apr. 3, 2026); *cf. Cleveland*, 531 U.S. at 23 (describing government's authority to "impose criminal penalties" as a "distinctively sovereign authority"). Additionally, military action and the planning of such action "is not the sort of action

by which private parties can engage in commerce." *Saudi Arabia v. Nelson*, 507 U.S. 349, 361-62 (1993). The military, as described in the indictment, did not use the information in its capacity as a market participant, and it "is not a commercial entity." *Blaszczak II*, 56 F.4th at 244. Thus, as the government put it in *Blaszczak II*, the core concern is "governmental in nature and has no private analogue." U.S. Supp. Letter Brief at 7, *Blaszczak II* (ECF No. 497).

Nor does the information share any other features of a "traditional property interest." The government does not seek to commercialize its confidential military plans and cannot "alienate its [military] authority." *Fountain v. United States*, 357 F.3d 250, 256 (2d Cir. 2004) (noting *Cleveland* "emphasized" "fact that the State could not alienate its licensing authority"). The information is not "revenue-enhancing," *id.* at 256 (identifying this as the most "weight[y]" factor), and the government has no "straightforward 'economic' interest" in the information, *Pasquantino v. United States*, 544 U.S. 349, 357 (2005). And the purported misappropriation of the information did not cause the government any "monetary loss," "a critical . . . threshold consideration." *Fountain*, 357 F.3d at 257; *Blaszczak II*, 56 F.4th at 244 (misappropriation had "no direct impact on the government's fisc"). Moreover, any financial interest the government might have related to the information—the indictment identifies no such interest—would clearly be "incidental" to the information itself. *Kelly*, 590 U.S. at 402.

The indictment seeks to escape all of this simply by reciting that the information "has pecuniary value." Indictment ¶24. This is not enough, as the government itself has said elsewhere. The information must have pecuniary value "*in the hands of the relevant government entity* to constitute 'property.'" U.S. Remand Brief at 2, *Blaszczak II* (ECF No. 453) (emphasis added). It must have "inherent market value" to its "owners," not to anyone who might come into possession of the information and use it. U.S. Supp. Letter Brief at 7, *Blaszczak II* (ECF No. 497). This

requirement clearly stems from *Cleveland*: "It does not suffice…that the object of the fraud may become property in the recipient's hands…the thing obtained must be property in the hands of the victim." 531 U.S. at 15; *United States v. Sekhar*, 570 U.S. 729, 737 (2013) (under *Cleveland*, only a property interest in the "hands" of the victim qualifies). In *Chastain*, for example, the NFT feature information was valuable in that it could be monetized by those who traded on it. The same was true in *Blaszczak II*. But that is insufficient.[18] Because the military information had no commercial value in the government's hands, the indictment's reference to pecuniary value is irrelevant.

**C. The Indictment Fails to Plead Specific Intent**

"Because mail fraud is a specific intent crime, the government must" further allege "that the defendant contemplated or intended some harm to the property rights of the victim" specifically. *United States v. Parse*, 789 F.3d 83, 121 (2d Cir. 2015) (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). It must plead that "[o]btaining the victim's … property" was "the 'aim,' not an 'incidental byproduct,' of the defendant's fraud." *Kousisis*, 605 U.S. at 122 (quoting *Kelly*, at 402, 404). The indictment fails to meet these requirements.

To the contrary, the indictment alleges that Van Dyke executed Polymarket transactions "knowing that he had obtained material nonpublic information subject to a duty of confidentiality, and which information has pecuniary value." Indictment ¶ 24. "Material nonpublic information" is not the same as "property," and such a description of the object of the alleged fraud is not sufficient to allege a specific intent to obtain "property" within the meaning of the fraud statutes.

---

[18] The Second Circuit previously rejected the argument that a defendant's profits can establish the victim's property interest. *See United States v. Miller*, 997 F.2d 1010, 1019 (2d Cir. 1993) (rejecting "constructive trust" theory of fraud, holding "a separate and identifiable property interest must also be established").

For that and the additional reasons stated above, the indictment fails to allege that Van Dyke had any specific intent to defraud the government of "property."

**D. Due Process and the Rule of Lenity Further Require Dismissal of Count Four**

"There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." *McNally*, 483 U.S. at 360. Statutes must further be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited" and to discourage "arbitrary and discriminatory enforcement." *Skilling*, 561 U.S. at 402-03. The government's charging theory flies in the face of these principles.

The government's theory is unprecedented and "would risk expanding the federal fraud statutes beyond property fraud as defined at common law and as Congress would have understood it." *Ciminelli*, 598 U.S. at 315. The theory, because it "treats mere information as the protected interest," would impermissibly expand fraud to the point where "almost any deceptive act" involving government information "could be criminal." *Id.* The indictment provides no ascertainable standard or limiting principle and "leaves the statute's outer boundaries ambiguous." *Id.* at 315 n.4. Any conviction stemming from "so shapeless" a theory "does not comport with the Constitution's guarantee of due process." *McDonnell*, 579 U.S. at 576; *Skilling*, 561 U.S. at 368 ("Construing [a] statute to extend beyond [its] core meaning … would encounter a vagueness shoal."). Indeed, as outlined *supra*, the instant prosecution theory contradicts the Department of Justice's *own representations* concerning the permissible scope of wire fraud in government information cases, and if endorsed would lead to the very arbitrary and discriminatory enforcement that due process does not allow.[19]

---

[19] The instant prosecution clearly seeks to evade the limits the Supreme Court imposed in *McNally* and *Skilling*. Under *McNally*, a "breach of fiduciary duty, without more, does not constitute [property] fraud." *United States v. Mittelstaedt*, 31 F.3d 1208, 1219 (2d Cir. 1994). Under *Skilling v. United States*, the honest services-fraud statute requires a bribe or kickback, and an employee's

Moreover, the Supreme Court and Second Circuit have repeatedly instructed that the rule of lenity counsels against reading into the fraud statutes new sweeping property theories. *See, e.g.*, *Skilling*, 561 U.S. at 410-11; *Cleveland*, 531 U.S. at 25 (rule of lenity is "especially appropriate in construing § 1341"); *McNally*, 483 U.S. at 359-60; *Evans*, 844 F.2d at 42 (interpretation of fraud statutes should be "colored by the rule of lenity, which the Supreme Court recently directed we consider"). For the reasons discussed above, the rule of lenity counsels against the government's proposed application of the wire fraud statute.

## VI. Count Five Must Also Be Dismissed

Count Five requires a "monetary transaction in criminally derived property" that "is derived from specified unlawful activity." 18 U.S.C. § 1957(a). The indictment alleges the purportedly laundered funds were "derived from the offense alleged in Count Four." Indictment ¶26. Because Count Four fails, no "specified unlawful activity" has been sufficiently alleged and Count Five must similarly be dismissed.

---

"undisclosed self-dealing" does not suffice. 561 U.S. 358, 409-10 (2010). The government's theory would allow prosecutors to "simply…recharacterize every breach of fiduciary duty" involving government information as property fraud, "let[ting] in through the back door the very prosecution theory that the Supreme Court tossed out the front." *United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988).

## VII. **Conclusion**

For the foregoing reasons, the Court should dismiss the indictment with prejudice.

Dated: July 31, 2026
New York, NY

Respectfully submitted,


Zach Intrater
Teny R. Geragos
Jason A. Driscoll
Daniela Manzi
AGNIFILO INTRATER LLP
140 Broadway, Ste. 4350
New York, NY 10005

Mark J. Geragos
Tina Glandian
GERAGOS & GERAGOS, APC
256 Fifth Ave., 6th Fl.
New York, NY 10017


cc: All counsel (by ECF)

## CERTIFICATION

The undersigned hereby certifies that the Memorandum of Law in Support of Gannon Ken Van Dyke's motion to dismiss the indictment complies with this Court's July 31, 2026, Order authorizing counsel to file an oversized brief in this matter. The word count, exclusive of the caption, tables, and signature block is 14,579 words according to the word-processing system used to prepare the document.

Dated: July 31, 2026
New York, NY

Respectfully,

Zach Intrater
Teny R. Geragos
Jason A. Driscoll
Daniela Manzi
AGNIFILO INTRATER LLP
140 Broadway, Ste. 4350
New York, NY 10005

Mark J. Geragos
Tina Glandian
GERAGOS & GERAGOS, APC
256 Fifth Ave., 6th Fl.
New York, NY 10017