UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

GANNON KEN VAN DYKE,

*Defendant.*

26 Cr. 156 (MMG)

**THE GOVERNMENT'S MOTIONS *IN LIMINE***

SEAN S. BUCKLEY
Deputy United States Attorney
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

Nicholas W. Chiuchiolo
Ryan B. Finkel
Juliana N. Murray

Assistant United States Attorneys

- *Of Counsel*

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ....................1

ARGUMENT ....................2

I. The Court Should Permit the Implementation of Limited Measures to Protect the True Name of the Special Forces Unit to Which the Defendant Was Assigned at the Time of Operation Absolute Resolve. ....................2

II. The Court Should Permit the Use of Limited Witness-Related Protective Measures. ....................5

III. The Defendant Should Not Be Allowed To Elicit Testimony about The Purported "Overclassification" of Documents or Information. ....................9

IV. The Court Should Preclude Any Mention of the Defendant's Prior "Good Acts" or Personal Factors Unconnected to Guilt or Innocence, Including Any Mention of the Defendant Being a "War Hero," or Any References to His Family. ....................11

V. The Court Should Preclude Argument that the Defendant's Polymarket Trades Did Not Amount to Disclosure of Classified Information. ....................14

VI. The Court Should Preclude Evidence or Argument that the Case Against the Defendant is Novel or Unprecedented. ....................17

VII. The Court Should Preclude Evidence or Argument that No Harm Was Caused by the Defendant's Criminal Conduct. ....................19

VIII. The Could Should Preclude Evidence or Argument About Statements Made by Polymarket Personnel About Inside Information. ....................20

IX. The Court Should Preclude Evidence about the Army's February 2026 Policy and DoW's October 2026 Memorandum Concerning Use of Non-Public Information on Prediction Market Platforms and Betting Markets. ....................21

X. The Court Should Preclude Any Mention of or Allusion to Potential Punishment for the Defendant, Including References to the Defendant's "Freedom" or "Liberty," His Life Being in the Jury's Hands, the Defendant Not Deserving Prison, or Requests that the Jury, in Substance, Send the Defendant "Home" or "Back to His Family" With a Verdict of Not Guilty. ....................25

CONCLUSION ....................28

## TABLE OF AUTHORITIES

**Cases** Page(s)

*ACLU v. Dep't of Def.*,
492 F. Supp. 3d 250 (S.D.N.Y. 2020)........................................ 4

*Alfred A. Knopf Inc. v. Colby*,
509 F.2d 1362 (4th Cir. 1975) ........................................ 4

*Chambers v. Mississippi*,
410 U.S. 284 (1973)........................................ 5

*Columbia & P. S. R. Co. v. Hawthorne*,
144 U.S. 202 (1892)........................................ 24

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986)........................................ 6

*Fitzgibbon v. CIA*,
911 F.2d 755 (D.C. Cir. 1990) ........................................ 4

*Halpern v. FBI*,
181 F.3d 279 (2d Cir. 1999)........................................ 4

*In re Manzano*,
945 F.3d 616 (2d Cir. 2019)........................................ 27

*Kewazinga Corp. v. Microsoft*,
No. 18 Civ. 4500 (GHW), 2021 WL 1222122 (S.D.N.Y. Mar. 31, 2021) ........................................ 3

*Kousisis v. United States*,
605 U.S. 114 (2025)........................................ 20

*Maryland v. Craig*,
497 U.S. 836 (1990)........................................ 8

*Michelson v. United States*,
335 U.S. 469 (1948)........................................ 12

*Pennsylvania v. Ritchie*,
480 U.S. 39 (1987)........................................ 5

*Rogers v. United States*,
422 U.S. 35 (1975)........................................................................................................ 26

*S.E.C. v. Obus*,
693 F.3d 276 (2d Cir. 2012) ........................................................................................ 15

*Shannon v. United States*,
512 U.S. 573 (1994)...................................................................................................... 26

*United States v. Al Kassar*,
660 F.3d 108 (2d Cir. 2011)......................................................................................... 13

*United States v. Alimehmeti*,
284 F. Supp. 3d 477 (S.D.N.Y. 2018)................................................................... 3, 7, 9

*United States v. Anderson*,
872 F.2d 1508 (11th Cir. 1989) .................................................................................... 11

*United States v. Bankman-Fried*,
179 F.4th 104 (2d Cir. 2026) ........................................................................................ 19

*United States v. Battaglia*,
No. 05 Cr. 774 (KMW), 2008 WL 144826, at (S.D.N.Y. Jan. 15, 2008)................................ 12

*United States v. Benedetto*,
571 F.2d 1246 (2d Cir. 1978)........................................................................................ 12

*United States v. Borrero*,
No. 13 Cr. 58 (KBF), 2013 WL 6020773 (S.D.N.Y. Nov. 1, 2013)........................................ 18

*United States v. Carton*,
No. 17 Cr. 680 (CM), 2018 WL 5818107 (S.D.N.Y. Oct. 19, 2018) ...................................... 13

*United States v. Cheung Kin Ping*,
555 F.2d 1069 (2d Cir. 1977)........................................................................................... 9

*United States v. Crowley*,
318 F.3d 401 (2d Cir. 2003)............................................................................................. 6

*United States v. Dawkins*,
999 F.3d 767 (2d Cir. 2021)........................................................................................... 12

*United States v. De Jesus-Casteneda*,
705 F.3d 1117 (9th Cir. 2013) .......................................................................................... 8

*United States v. Del Rosario*,
No. 12 Cr. 81 (KBF), 2012 WL 2354245 (S.D.N.Y. June 14, 2012 ....................................... 26

*United States v. Doe*,
629 F. App'x 69 (2d Cir. 2015) .......... 3

*United States v. Fazio,*
No. 11 CR 873 (KBF), 2012 WL 1203943 (S.D.N.Y. Apr. 11, 2012), *aff'd*, 770 F.3d 160 (2d Cir. 2014) .......... 13

*United States v. George*,
1992 WL 200027 (D.D.C. 1992) .......... 7, 9

*United States v. Harris*,
491 F.3d 440 (D.C. Cir. 2007) .......... 12

*United States v. Irving*,
No. 07-107 (PLF), 2008 WL 163653 (D.D.C. Jan. 18, 2008) .......... 14

*United States v. Litvak*,
808 F.3d 160 (2d Cir. 2015) .......... 19

*United States v. Mahaffy*,
693 F.3d 113 (2d Cir. 2012) .......... 16

*United States v. Moses*,
109 F.4th 107 (2d Cir. 2024) .......... 16

*United States v. Naseer*,
No. 10 Cr. 19 (RJD), 2015 WL 13843166 (E.D.N.Y. Jan. 26, 2015) .......... 7, 8

*United States v. Nazzaro*,
889 F.2d 1158 (1st Cir. 1989) .......... 14

*United States v. O'Hagan*,
521 U.S. 642 (1997) .......... 15, 16

*United States v. Owens*,
484 U.S. 554 (1988) .......... 6

*United States v. Paccione*,
949 F.2d 1183 (2d Cir. 1991) .......... 12

*United States v. Reese*,
933 F. Supp. 2d 579 (S.D.N.Y. 2013) .......... 26

*United States v. Regan*,
103 F.3d 1072 (2d Cir. 1997) .......... 18

*United States v. Rivera*,
No. 13 Cr. 149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) .................................. 13

*United States v. Rosado*,
728 F.2d 89 (2d Cir. 1984)....................................................................................... 18

*United States v. Rosen*,
520 F. Supp. 2d 786 (E.D. Va. 2007) ........................................................................ 10

*United States v. Runner*,
143 F.4th 146 (2d Cir. 2025) ..................................................................................... 20

*United States v. Scarpa*,
897 F.2d 63 (2d Cir. 1990)........................................................................................ 12

*United States v. Schulte*,
No. 17 Cr. 548 (PAC), 2019 WL 3764662 (S.D.N.Y. July 22, 2019)....................................... 3

*United States v. Smith*,
750 F.2d 1215 (4th Cir. 1984) ................................................................................... 10

*United States v. Sterling*,
724 F.3d 482 (4th Cir. 2013) ................................................................................... 6, 7

*United States v. Stewart*,
No. 03 Cr. 717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004)...................................... 18

*United States v. Urena*,
8 F. Supp. 3d 568 (S.D.N.Y. 2014) ............................................................................. 7

*United States v. Washington*,
106 F.3d 983 (D.C. Cir. 1997)................................................................................... 14

*United States v. Whitman*,
904 F. Supp. 2d 363 (S.D.N.Y. 2012)......................................................................... 16

*United States v. Wilson*,
750 F.2d 7 (2d Cir. 1984).......................................................................................... 10

**Statutes**

7 U.S.C. § 6c .................................................................................................. 15, 23, 25
18 U.S.C. § 793................................................................................................................ 23

**Rules**

Fed. R. Evid. 401 ........ *passim*
Fed. R. Evid. 403 ........ 10, 11, 15, 17, 25
Fed. R. Evid. 404 ........ 12
Fed. R. Evid. 405 ........ 12

**Regulations**

5 C.F.R. § 2635.702 ........ 22, 23
5 C.F.R. § 2635.703 ........ 22
5 C.F.R. § 2635.704 ........ 22
17 C.F.R. § 180.1 ........ 22, 25

## PRELIMINARY STATEMENT

The Government submits these motions *in limine* in advance of the trial of defendant Gannon Ken Van Dyke, which is scheduled to begin on December 7, 2026. For the reasons set forth below, the Government seeks rulings to:

- Permit limited measures to protect the true name of the special forces unit to which the defendant was assigned at the time of his offense conduct.
- Implement limited witness-related protective measures for certain Department of War ("DoW") witnesses.
- Preclude the defendant from making arguments or eliciting testimony about the purported "overclassification" or "misclassification" of documents or information.
- Preclude any mention of prior "good acts" or personal factors unconnected to guilt or innocence, including any mention of the defendant as a "war hero" or acknowledgement of his family members in the courtroom in the presence of the jury.
- Preclude argument that the defendant's trades on Polymarket did not amount to a "disclosure" of non-public information.
- Preclude argument that the case against the defendant is novel or unprecedented.
- Preclude evidence or argument that the United States Government, the DoW, and members of the armed forces did not ultimately suffer harm.
- Preclude evidence or argument about statements made by Polymarket personnel concerning the use of non-public information to place trades on the platform.
- Preclude evidence about measures taken by the U.S. military following the defendant's trading, including the Army's February 2026 policy and the DoW's October 2026 memorandum concerning use of non-public information on prediction market platforms and betting markets.
- Preclude any mention of or allusion to potential punishment for the defendant, including references to the defendant's "freedom" or "liberty," the defendant's life being in the jury's hands, the defendant not deserving prison, or requests that the jury, in substance, send the defendant "home" or "back to his family" with a verdict of not guilty.

## **ARGUMENT**[1]

### I. The Court Should Permit the Implementation of Limited Measures to Protect the True Name of the Special Forces Unit to Which the Defendant Was Assigned at the Time of Operation Absolute Resolve.

The Government respectfully requests that, at trial, the Court prohibit the use of the true name of the unit to which the defendant was assigned; require the parties to refer to the defendant's unit as "the Special Forces Unit"; and preclude the defense from revealing, or eliciting testimony that would reveal, the true name of that unit in open court. If the Court approves these limited protective measures, the Government intends to substitute the Special Forces Unit for the true name of the unit in its exhibits and instruct its witnesses to substitute that term for the true name of the unit in any testimony.

Disclosure of the Special Forces Unit's true name in open court—in combination with the specific details about the Special Forces Unit's involvement in Operation Absolute Resolve, which will necessarily be revealed as part of the Government's case-in-chief—would pose a significant risk to the security of the Special Forces Unit and its operatives. The testimony and exhibits at trial will include information shared or received by the defendant about details of Operation Absolute

[1] Pursuant to the Court's individual rules and practices, the Government attempted to meet-and-confer with defense counsel concerning the majority of its motions *in limine*. While the defendant, through counsel, was generally agreeable to security measures for the protection of classified information and witness safety, the parties agreed that the Court should decide specific protective measures. As to most of the other motions, defense counsel informed the Government that the Government should seek relief from the Court. The parties did not expressly meet-and-confer on the Government's request to preclude the defendant from making arguments about purported "overclassification" or "misclassification" of documents or information but, based on discussions with the defense and arguments made in briefing and before the Court, the Government believes the defense may make arguments along these lines. The parties did not expressly meet-and-confer on the Government's request to preclude any mention of or allusion to potential punishment for the defendant but, as is customary, the Government seeks a written ruling on this issue in advance of trial.

Resolve and the Special Forces Unit's role in that mission, including the number of Special Forces Unit members who participated in both the planning and execution of the mission, their methods of communication in advance of and during the mission, their weaponry, their coordination with other U.S. military forces, and their offensive and counteroffensive techniques and efforts. These facts, when combined with the true name of the unit, could provide foreign adversaries with information that could be used and exploited in, for example, developing plans to counter the efforts of the Special Forces Unit in the future. Because disclosure of the name of the Special Forces Unit in combination with those details would potentially cause serious harm to U.S. Government interests and national security, the Government has not identified the true name of the facility in open court or in unsealed or unclassified submissions in this case.

Courts in this district routinely adopt limited protective measures—including approving sealing, redactions, and substitutions—when important national security or law enforcement concerns are at issue. *See, e.g.*, *United States v. Doe*, 629 F. App'x 69, 73 (2d Cir. 2015) ("The district court properly determined that sealing was required in order to serve the Government's compelling interest in promoting safety and ongoing national security investigations."); *United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 3764662, at *4 (S.D.N.Y. July 22, 2019) (authorizing substitutions for names of offices and facilities used by the CIA due to national security concerns if the true names and locations were revealed); *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 488 (S.D.N.Y. 2018) (partially closing courtroom to protect the identities of undercover agents on the basis that revealing this information in open court could "compromise important national security interests"); *cf. Kewazinga Corp. v. Microsoft*, No. 18 Civ. 4500 (GHW), 2021 WL 1222122, at *3 (S.D.N.Y. Mar. 31, 2021) ("Higher values that may justify the sealing of documents include national security concerns . . . ."). Here, the true name of the Special

Forces Unit is irrelevant to the charges against the defendant. Indeed, the name of the unit itself does not "make a[ny] fact more or less probable than it would be without the evidence" nor is it "of consequence in determining the action." Fed. R. Evid. 401. Yet, as described above, disclosure of this information at trial—which, to date, has not been made public by the U.S. Government—would unnecessarily risk harm to national security and the safety of U.S. operatives assigned to the Special Forces Unit and conducting future missions with the unit.

Notably, the fact that certain information about the Special Forces Unit appears to have been released on the Internet has no bearing on the Government's request. Courts have repeatedly recognized that "in the arena of intelligence and foreign relations," there can be "a critical difference between official and unofficial disclosures." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990). For example, "[i]t is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so." *ACLU v. Dep't of Def.*, 492 F. Supp. 3d 250, 265 (S.D.N.Y. 2020) (citing *Alfred A. Knopf Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975)). "Rumors and speculations circulate" and can "get into print," and "others may [then] republish [that] previously published material," but such reports are properly understood "as being of uncertain reliability" and insufficient for courts to displace the Executive Branch's expert judgment that "damage [to] the national security" could reasonably be expected from disclosing sensitive information possessed by those with first-hand knowledge of the Nation's sensitive intelligence and law enforcement activities. *Id.* at 1368, 1370. Such determinations based on expert assessments of the potential for harm to national security are therefore "generally unaffected" by whether the information is asserted to have entered "the realm of public knowledge." *Halpern v. FBI*, 181 F.3d 279, 294 (2d Cir. 1999). Thus, notwithstanding the existence of limited open-source

reporting about the Special Forces Unit, the Government respectfully submits that a pseudonym should be used when referring to the unit at trial.

Accordingly, the Government respectfully requests that the Court implement the proposed limited protective measures to ensure the true name of the Special Forces Unit is not disclosed at trial.

## II. The Court Should Permit the Use of Limited Witness-Related Protective Measures.

The Government requests that the Department of War witnesses (the "DoW Witnesses") be permitted to testify using pseudonyms and light disguises, and that the defense be precluded from eliciting any personally identifiable information at trial about the DoW Witnesses that would reveal these witnesses' true identities.[2] The Government also requests an order barring any sketching or other recording of the appearance of these witnesses. These protective measures are justified by compelling national security interests and witness safety concerns, and are consistent with the defendant's rights under the Sixth Amendment.

Although the Confrontation Clause of the Sixth Amendment ordinarily guarantees a defendant the "right . . . to be confronted with the witnesses against him," which includes the right to conduct cross-examination, *see Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987), the Supreme Court has never held that the right is absolute, *see Chambers v. Mississippi*, 410 U.S. 284, 295 (1973). The Confrontation Clause "guarantees only an opportunity for effective cross-

[2] While the Government is still determining which specific witnesses it intends to call at trial, the DoW Witnesses will all be individuals who are or were assigned to the Special Forces Unit, including at the time the Special Forces Unit was involved in planning and executing Operation Absolute Resolve. The Government will provide the DoW Witnesses' true identities to the defense in advance of trial and can provide the Court with additional details about each of the DoW Witnesses once the Government has finalized its decisions regarding which DoW employees it will call to testify.

examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 484 U.S. 554, 559 (1988) (internal quotation marks omitted). Trial judges "'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

In applying these settled principles, courts have repeatedly recognized that national-security witnesses—like undercover officers, confidential informants, and military or intelligence personnel—present precisely the type of safety and operational-integrity concerns that justify reasonable limits on identity-related questioning. "There can be no doubt that the identity of" such operatives or employees "is sensitive information." *United States v. Sterling*, 724 F.3d 482, 516 (4th Cir. 2013). Public disclosure of that information would "subject the operatives to targeting by hostile foreign intelligence services and terrorist organizations, and creates a grave danger to the operatives, their families, and the operations in which they are engaged." *Id.* Here, public disclosure of the DoW Witnesses' identities poses potential national security harm and safety risks. In particular, disclosure of the true names of DoW Witnesses could allow a foreign adversary to target the members of the Special Forces Unit who participate in sensitive U.S. military operations for hacking, intelligence collection, or other adverse action. Unlike in situations where a criminal organization may seek to retaliate against a witness, the foreign adversaries who would be interested in learning the identities of U.S. Government personnel with access to sensitive material and who participate in sensitive activities are numerous and exceptionally well resourced. Those dangers are squarely present here given the sensitive, classified nature of the DoW Witnesses'

assignments to the Special Forces Unit—including their participation in Operation Absolute Resolve, among other Special Forces Unit missions.

Courts therefore routinely authorize the use of pseudonyms as "a means of protecting [witnesses'] safety and ability to continue to work." *Alimehmeti*, 284 F. Supp. 3d at 489-90; *see also Sterling*, 724 F.3d at 516 (allowing ten CIA witnesses to testify using pseudonyms); *United States v. Naseer*, No. 10 Cr. 19 (RJD), 2015 WL 13843166, at *2-3 (E.D.N.Y. Jan. 26, 2015) (permitting the use of pseudonyms at trial to protect identities of MI-5 officers); *United States v. Urena*, 8 F. Supp. 3d 568, 572-74 (S.D.N.Y. 2014) (approving undercover agent's use of a pseudonym at trial to, among other things, protect the agent's safety); *United States v. George*, 1992 WL 200027, at *2 (D.D.C. 1992) (ruling that the names of witnesses from the CIA "shall not be disclosed publicly"). Consistent with this authority, the use of pseudonyms here is necessary to prevent the disclosure of the DoW Witnesses' sensitive identities and to protect their safety and operational effectiveness.[3] Because a witness's true name is immaterial to the defendant's guilt or innocence and because identity-related questioning would defeat the very purpose of the protective measures the Court authorizes, the defense should likewise be precluded from eliciting any information on cross-examination that could reveal the witnesses' names or other identifying details. *See* Memorandum & Order, *United States v. Pugh*, No. 15 Cr. 116 (NGG) (E.D.N.Y. Feb. 24, 2016), at 2-3 ("[C]ounsel shall not elicit from the [undercover employee] any information that would disclose his true identity or place of residence, or the whereabouts of his family."); *United*

---

[3] Certain of the potential DoW Witnesses may have since retired from, or be in the process of retiring from, the Army. While disclosing the true names of those witness(es) would not implicate their ongoing operational effectiveness, the concerns about safety and the potential of targeting or attempted exploitation by foreign adversaries described herein apply with equal force even for retired Special Forces Unit members.

*States v. Salah*, No. 03 Cr. 978 (AJSE) (N.D. Ill. Aug. 29, 2006), at 2 ("Defendants may not question these witnesses regarding their true identities."). And because the restriction affects only identifying information and leaves all substantive areas of cross-examination fully available, the use of pseudonyms is a reasonable and constitutionally permissible measure.

The same national-security imperatives justify allowing the DoW Witnesses to wear light, non-obstructive disguises designed solely to prevent recognition. Although disguises implicate the Confrontation Clause's face-to-face component, that right is not absolute and may "give way to considerations of public policy and the necessities of the case." *Maryland v. Craig*, 497 U.S. 836, 848 (1990). Courts have upheld the use of such narrowly tailored disguises where, as here, the witness remains physically present in the courtroom, testifies under oath, is fully exposed to cross-examination, and can be entirely observed by the jury. *See Naseer*, 2015 WL 13843166, at *4 (permitting law enforcement witness to testify "wearing disguises in the form of wigs and light makeup"); *United States v. Martinez*, No. 06 CR 0591 (RPP), 2007 WL 2710430, at *3 (S.D.N.Y. Sept. 14, 2007) (permitting an undercover officer to testify in disguise); *United States v. De Jesus-Casteneda*, 705 F.3d 1117, 1121 (9th Cir. 2013) (despite an informant's disguise in the form of a wig and mustache, his reliability was assured because "he was physically present," "testified under oath," "was subject to cross-examination," and "the jury was able to hear his voice, see his face including his eyes and facial reactions to questions, and observe his body language"). The modest disguises proposed here will not obscure the witnesses' eyes, facial expressions, or demeanor; they function only to prevent the witnesses from being publicly identified.

Finally, the Court should also authorize complementary security measures that prevent indirect identification of the DoW Witnesses: specifically, permitting them to use non-public entrances and exits, and prohibiting the use of non-official recording devices or sketching during

their testimony. Courts approve such precautions in cases involving undercover or national-security witnesses because they protect against public dissemination of identifying details while imposing no prejudice on the defendant. *See Alimehmeti*, 284 F. Supp. 3d at 495 (noting that allowing testifying witnesses to use non-public entrances and exits to the courthouse is "commonplace" in cases involving undercover officers (citing cases)); *George*, 1992 WL 200027, at *2-3 (allowing CIA witnesses to "enter and exit the courthouse and courtroom without using the public entrances," and barring sketches during their testimony). These measures ensure that the protective value of pseudonyms and disguise is not undermined by inadvertent public exposure and are narrowly tailored to the compelling interests at stake.

Accordingly, the court should impose the limited protective measures requested because, in combination, they represent reasonable, constitutionally permissible safeguards necessary to protect the safety of the DoW Witnesses and the integrity of ongoing national-security operations.

## III. The Defendant Should Not Be Allowed To Elicit Testimony about The Purported "Overclassification" of Documents or Information.

The defendant should be precluded from arguing at trial that the DoW "over-classified" or "misclassified" information or materials. Such an argument is irrelevant and improper because it invites the jury to decide the case based on extraneous policy critiques rather than the elements of the charged offenses. The Second Circuit has long held that a criminal defendant may not seek acquittal "on the basis of extraneous public policy considerations." *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1074 (2d Cir. 1977); *id.* at 1073 (jury must not be diverted into debating "law enforcement policy"). Whether the defendant believes that government classification decisions were wise, unwise, excessive, or flawed is precisely the sort of collateral policy dispute that

*Cheung* forbids and is irrelevant to whether he misused confidential government information for personal gain.

As a matter of relevance, arguments about "overclassification" fall squarely outside Rule 401. None of the charges require the Government to prove that the classified information at issue was *properly* classified—only that it was confidential, nonpublic government information that the defendant was not authorized to use for personal trading. Moreover, courts have consistently recognized that defendants may not mount collateral attacks on Executive Branch classification judgments in a criminal trial. *See, e.g., United States v. Smith*, 750 F.2d 1215, 1217 (4th Cir. 1984) ("[T]he government . . . may determine what information is classified. A defendant cannot challenge this classification. A court cannot question it."); *United States v. Rosen*, 520 F. Supp. 2d 786, 790 (E.D. Va. 2007) ("It is not open to the court to question or second-guess the classification status of any document. . . ."). Such challenges are irrelevant because they shed no light on the defendant's knowledge, conduct, or intent, and jurors are not tasked with reviewing or second-guessing national-security determinations.

Even if the defendant could identify some marginal probative value in contesting classification decisions—which he cannot—that value would be substantially outweighed by the dangers proscribed by Rule 403. *See* Fed. R. Evid. 403. Allowing arguments about "overclassification" would risk transforming this trial into a referendum on intelligence practices, classification policy, or bureaucratic decision-making, which would confuse the issues, mislead the jury, and draw attention away from the key questions that must be decided at trial. Arguments about overclassification would necessarily require examining the underlying intelligence-gathering or operational planning activities that supported classification, the very subject courts have found to be not proper for the jury. *See, e.g.*, *United States v. Wilson*, 750 F.2d 7, 9 (2d Cir.

1984) (upholding trial court's exclusion of defendant's testimony about intelligence agency operations pursuant to Rule 403); *United States v. Anderson*, 872 F.2d 1508, 1519 (11th Cir. 1989) ("Whatever probative value that Carlisle's participation in a prior covert operation had to this case, the admission of evidence regarding the details of those activities would only serve to impermissibly divert the jury's attention away from the basic charges in this indictment.").

Accordingly, because disputes over the propriety of classification decisions have no relevance to any element of the offenses and pose a pronounced risk of jury confusion, unfair prejudice, and a mini-trial on national-security bureaucracy, the Court should preclude the defense from presenting evidence or argument that the DoW improperly classified, over-classified, or misclassified any specific piece of information.

## IV. The Court Should Preclude Any Mention of the Defendant's Prior "Good Acts" or Personal Factors Unconnected to Guilt or Innocence, Including Any Mention of the Defendant Being a "War Hero," or Any References to His Family.

The Court should preclude the defendant from offering evidence or argument concerning, or addressing or discussing, any prior good conduct, including those derived from his career in the military, or his family, health, or life during pretrial release. Among other things, the Court should explicitly preclude sensational claims about the defendant being an "American war hero,"[4] or any acknowledgement of the defendant's family members in the courtroom in the presence of the jury. The Government is unaware of any lawful basis for such evidence or acknowledgement, and its predictable purpose would be to engender sympathy for the defendant and thereby to encourage a verdict based on irrelevant and impermissible considerations. The defendant should be precluded

[4] This concern is not speculative. The defense has already described the defendant as an "American hero" in statements to the media. *See* https://www.youtube.com/watch?v=xXLWwX3IRZk (last visited Oct. 24, 2026).

from mentioning such subjects, including in his opening statement, absent a showing, outside the presence of the jury, that such a factor bears on his guilt or innocence. *See, e.g., United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence relating to the defendant's family); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

To the extent that the defendant may seek to present evidence or argument concerning his prior commission of "good acts," including his military service, or to offer evidence of his non-criminal activities to disprove his guilt of the crimes charged, he should be precluded from doing so. Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Similarly, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait" of character, or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) ("[C]haracter evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts." (citing *Michelson v. United States*, 335 U.S. 469, 477 (1948)); *United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ("No less than evidence of a

defendant's prior 'bad acts' used to show that he committed the crime charged,[ ] 'good acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—*i.e.*, if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit."); *United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("[A] defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014).

Furthermore, pursuant to Federal Rule of Evidence 401, "'evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.'" *United States v. Carton*, No. 17 Cr. 680 (CM), 2018 WL 5818107, at *3 (S.D.N.Y. Oct. 19, 2018) (quoting *United States v. Boykoff*, 67 App'x 15, 20-21 (2d Cir. 2003)). And under Federal Rule of Evidence 403, "a district court may exclude evidence of a defendant's prior good acts if it finds that any minimal probative value of such evidence is outweighed by the likelihood of jury confusion and the risk of jury nullification." *United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (citing *United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) ("And the trial judge was rightly concerned that, to the extent any of the evidence [of prior good acts] could be construed to relate to the charged conspiracies, the jury would find it extremely confusing, if not incomprehensible.")).

The defendant should accordingly be precluded from offering evidence or argument including in his opening statement, of the defendant's former military service, or any other specific instance or instances of his prior good acts, if offered by the defendant to prove his general good character, including such traits as attention to duty, commitment to public service, bravery, accolades, commendations, performance reviews, and other records. Such evidence is not

admissible because it is not pertinent to an essential element of any of the charges pending against him. *See, e.g.*, *United States v. Washington*, 106 F.3d 983, 999-1000 (D.C. Cir. 1997) (holding that a police officer's commendations were not admissible because the defendant's dedication, aggressiveness and assertiveness in investigating drug dealing and carjacking was neither pertinent to, nor an essential element of, bribery, conspiracy, or drug and firearms charges with which he was charged); *United States v. Irving*, No. 07-107 (PLF), 2008 WL 163653, at *1 (D.D.C. Jan. 18, 2008) (excluding evidence of the defendant's professional awards because the awards do not reflect pertinent character traits and the criminal allegations were plainly unrelated to the defendant's professional competence and integrity); *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir. 1989) (affirming the district court's refusal to admit evidence of the defendant's awards and commendations from his military service and police service because "the traits they purport to show—bravery, attention to duty, perhaps community spirit—were hardly 'pertinent' to the crimes of which [the defendant] stood accused" and because "the evidence, as presented below, seems to us classic hearsay, and inadmissible for that reason as well").

Likewise, for the same reasons, the defendant should be precluded from offering evidence or argument, including in his opening statement, of his family, health circumstances, the publicity he has endured, any issues he has had during pretrial release, or any acts of charity or other good conduct.

## V. The Court Should Preclude Argument that the Defendant's Polymarket Trades Did Not Amount to Disclosure of Classified Information.

The defendant has suggested that his Polymarket trades did not amount to a disclosure of classified information and there is a "factual argument [about] whether or not [the defendant's trades] actually divulge anything." (Oct. 7. 2026 Hr'g Tr. 66, 84). That argument should be

categorically precluded. None of the charged offenses require the Government to prove that the defendant disclosed classified information; whether his trades "actually divulged" anything is irrelevant under Rule 401 and, in any event, substantially outweighed by the dangers of jury confusion and prejudice under Rule 403. The Court therefore should preclude the defense from raising this argument at trial.

Counts One through Four of the Indictment each charge the defendant with misusing or misappropriating confidential government information for personal gain, in connection with a swap transaction or wire. Under the misappropriation theory, which is common to all counts,[5] liability "premises [itself] on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *United States v. O'Hagan*, 521 U.S. 642, 652-53 (1997). The fraud occurs when a person entrusted with confidential information uses it for trading "in breach of a duty owed to the source of the information." *Id.* at 652. The "act of misappropriation itself is deceitful," *S.E.C. v. Obus*, 693 F.3d 276, 287 (2d Cir. 2012) (citing *O'Hagan*, 521 U.S. at 653), and as *O'Hagan* itself demonstrates, it is not necessary for a trading insider to tip or disclose confidential information to be liable for misappropriation, *see O'Hagan*, 521 U.S. at 653.

Here, the defendant owed a fiduciary duty of loyalty and confidentiality to his employer, the United States Army, and he breached that duty by using "sensitive, nonpublic, classified information" (Ind. ¶ 1) about Operation Absolute Resolve to place trades on Polymarket. The offense is complete the moment the defendant secretly exploits that entrusted information for

---

[5] Section 6c(a)(4)(C) of Title 7 of the U.S. Code, which the defendant is charged with violating in Count Two, makes it unlawful to "misappropriate . . . information," and both Counts Three and Four are premised on the misappropriation theory recognized in *United States v. O'Hagan*, 521 U.S. 642, 652-53 (1997). While Count One, which charges a violation of 7 U.S.C. § 6c(a)(3), only requires proof that a government agent or employee "use[d] . . . information in his personal capacity and for personal gain," for purposes of this motion the distinction does not matter.

personal gain. Whether his trades publicly revealed or "divulged" any classified information is beside the point. *See O'Hagan*, 521 U.S. at 654.

For similar reasons, the defendant should be precluded from making arguments that he did not violate applicable nondisclosure agreements or Alternative Compensatory Control Measures ("ACCM"), which are classified information security briefing acknowledgments that governed his access to classified information. The evidence will show that the defendant was briefed into certain ACCMs pertaining to Operation Absolute Resolve and his work more generally in the Special Forces Unit, and that he executed nondisclosure forms acknowledging that he was entrusted with Sensitive Compartmented Information and was required to keep it secret. (Ind. ¶ 4). That evidence is relevant because it demonstrates that the defendant understood the information at issue to be confidential and that the U.S. Army treated it as such. *See United States v. Mahaffy*, 693 F.3d 113, 135 n.14 (2d Cir. 2012) (confidentiality may turn on "written company policies, employee training, measures the employer has taken to guard the information's secrecy," and other steps showing exclusive control). But while the existence of these agreements is probative of the defendant's knowledge and of the Army's treatment of the information, whether the defendant technically complied with or breached the contractual language of a nondisclosure agreement or ACCM is irrelevant to the charged offenses and the misappropriation theory of insider trading. *See United States v. Moses*, 109 F.4th 107, 115 (2d Cir. 2024) (rejecting the argument that "violation of an affirmative disclosure policy . . . is required to prove fraud"); *see also United States v. Whitman*, 904 F. Supp. 2d 363, 368 (S.D.N.Y. 2012) (scope of an employee's duty to keep material non-public information confidential is defined by federal common law).

Allowing the defendant to argue that he is not guilty because he supposedly did not violate his nondisclosure agreements or classified security information briefing acknowledgments by not

divulging information would also create a substantial risk of jury confusion. That argument invites jurors to conflate contractual compliance with the distinct, implied fiduciary duty that gives rise to misappropriation liability, suggesting incorrectly that the Government must prove a breach of the agreement, or that compliance negates criminal intent. Unless the Government affirmatively places contractual breach at issue, introducing such arguments would divert the jury into an irrelevant, legally incorrect, and misleading inquiry about the meaning and application of these documents rather than the purpose for which they are being offered, to establish the defendant's knowledge of the confidentiality of the information and that the military treated the information as such. Rule 403 therefore bars the defense from advancing this argument because whatever minimal relevance it might have is substantially outweighed by the danger of confusing the issues and misleading the jury.

Accordingly, the Court should preclude the defendant from arguing that his Polymarket trades did not amount to a disclosure of classified information under Rules 401 and 403.

## VI. The Court Should Preclude Evidence or Argument that the Case Against the Defendant is Novel or Unprecedented.

The defendant has argued in briefing and in court that this case is "novel [and] never before prosecuted," "novel in four different ways," "unprecedented," and a "government[] experiment." (Dkt. No. 23 at 1, 21; Oct. 7. 2026 Hr'g Tr. 86). The defendant has also argued that he "was charged in response to media reporting and public outcry about prediction market unfairness" and that the Government has "prosecute[d] a single solider while leaving the vast majority of similar conduct untouched." (Dkt. No. 23 at 25, 27). The Court should exclude such claims in front of the jury because they amount to attempts at jury nullification.

The sole question before the jury is the guilt of the defendant, not the motivations of the prosecutors or the novelty of the legal theory, or the defendant's musings about perceived lack of enforcement. It is well established that the Government's motives for the prosecution of a defendant are irrelevant to guilt or innocence and therefore cannot be presented to the jury. *See United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) (affirming decision precluding "evidence at trial that the grand jury investigation was illegitimate"); *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"); *United States v. Borrero*, No. 13 Cr. 58 (KBF), 2013 WL 6020773, at *2 (S.D.N.Y. Nov. 1, 2013) (precluding cross examination regarding a government charging decision in part because "the limited amount of probative value that the . . . charging decisions add is substantially outweighed by the risk of undue confusion and an unnecessary sideshow . . ."); *United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]").

Moreover, any plausible relevance to argument about the state of regulation on prediction markets and the alleged novelty of the charges is substantially outweighed by the danger of confusing issues, misleading the jury, and wasting time. Opening the door to arguments about the state of regulation on prediction markets would necessarily involve a digression into the various agencies responsible for regulating the industry and the different ways in which they have, and have not, regulated the space. Claims about the novelty of the prosecution would, similarly, require

a detour into the history of insider trading prosecutions.[6] "If [the defendant] were permitted to argue that this case is novel or unprecedented . . . the Court would have to allow the Government to argue the contrary or explain the facts and holding of [prior cases] to the jury." *United States v. Chastain*, No. 22 Cr. 305 (JMF) (Dkt. No. 90). These would be time-wasting sideshows that would risk confusing the jury about the facts relevant to this case and misleading jurors into believing the case was a referendum on prediction markets writ large. None of that is pertinent to the jury's task of deciding whether the defendant committed the charged crimes. It should be excluded entirely.

## VII. The Court Should Preclude Evidence or Argument that No Harm Was Caused by the Defendant's Criminal Conduct.

The Court should preclude the defendant from admitting evidence or arguing that the defendant's insider trading caused no harm, including to the DoW, fellow members of the armed forces, or to the success of Operation Absolute Resolve. The charges against the defendant do not require the Government to show that the defendant intended to cause harm, or in fact caused harm, to any victim. Counts One and Two of the Indictment involve the use of non-public government information for personal gain. Similarly, Count Three, commodities fraud, involves embezzlement of non-public government information for personal gain. Commodities fraud does not require proof that the defendant caused actual harm. *See United States v. Bankman-Fried*, 179 F.4th 104, 114 (2d Cir. 2026) (intent to cause economic loss not an element of wire fraud, securities fraud, or commodities fraud); *United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015) ("intent to harm is

[6] The defendant's crime is not novel. The core theory of the Indictment is that the defendant took information that he had pledged to keep confidential and, though he was duty-bound not to do so, he used it to make a personal profit. That theory of criminality is not new. The U.S. Supreme Court, the U.S. Court of Appeals for the Second Circuit, and numerous judges in this District have repeatedly dealt with this type of misconduct and for decades have labeled it fraud under a multitude of statutes.

not a component of the scienter element of securities fraud under Section 10(b)"). Likewise, Count Four, wire fraud, does not require the Government to show intent to harm or actual harm. *See Kousisis v. United States*, 605 U.S. 114, 124 (2025) ("[T]he wire fraud statute is agnostic about economic loss. . . . [A] defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off."); *United States v. Runner*, 143 F.4th 146, 161 (2d Cir. 2025) ("[S]ecuring a conviction under the mail or wire fraud statutes does not require proof that the scheme intended net economic loss.").

Accordingly, under Rules 401 and 403, the Court should preclude the defendant from introducing evidence or making arguments that his conduct caused no harm.

## VIII. The Could Should Preclude Evidence or Argument About Statements Made by Polymarket Personnel About Inside Information.

The defendant has argued that Polymarket has encouraged insiders to place trades on the platform because it allows "all of the information asymmetries to be brought into the marketplace with the idea that that then sets the most effective, most accurate price." (Oct. 7, 2026 Hr'g Tr. 56-57). The Government disputes the defendant's contention that it was Polymarket's policy to encourage insider trading. But in any event, the Court should preclude the defendant from offering evidence or argument regarding Polymarket personnel supposedly encouraging insider trading because such evidence is irrelevant and highly prejudicial, and, if offered by the defendant, could prompt a digression in the form of competing proof by the Government to disprove the theory. As a threshold matter, the Government is unaware of any evidentiary support that the defendant was aware of purported statements by Polymarket personnel encouraging insider trading *at the time of his trades*—the only time that it could have any conceivable relevance. On the contrary, the evidence shows the defendant was indifferent to the platform he used to place his illicit trades. At

trial, the Government will offer evidence showing that the defendant first attempted to register an account with Kalshi, Polymarket's chief competitor, but his Kalshi account was rejected. Absent evidence that the defendant was aware of the alleged statements by Polymarket personnel and chose the platform specifically because of Polymarket's alleged encouragement of insider trading, there is zero relevance to this purported evidence.

But even if the defendant could testify truthfully that he was aware of statements by Polymarket's CEO encouraging insider trading, evidence of those statements would still be irrelevant because, as explained above, the defendant's criminal liability for insider trading turns on common law duties owed to his employer. And, as the Government has made clear, it is not pursuing a wire fraud theory based on Polymarket's terms of service. (Oct. 7 Hr'g Tr. 77-78). Accordingly, the Polymarket CEO's supposed views on insider trading are wholly irrelevant to the defendant's criminal liability. Moreover, any suggestion that Polymarket encouraged insiders to use its platform to trade in violation of a duty of confidentiality they owed to their employers or other entities would be prejudicial and would lead to jury confusion over issues not properly before them.

## IX. The Court Should Preclude Evidence about the Army's February 2026 Policy and DoW's October 2026 Memorandum Concerning Use of Non-Public Information on Prediction Market Platforms and Betting Markets.

The defendant should be precluded from offering evidence of policy and memoranda that post-date the offense conduct to somehow suggest either that the policies in place at the time of the defendant's trades permitted him to use confidential or classified U.S. Government information for his own profit in violation of his fiduciary duties, or that the existing policies were somehow unclear on that point. These arguments distract from what is at issue—namely, the laws and regulations that applied to the defendant's conduct when he engaged in the trading that is the

subject of this case, and the defendant's knowledge and intent. Subsequent policy notices by U.S. Government bodies do not bear on those points and risk confusing the jury about the applicable restrictions at the time of the charged conduct. And there is a further risk of unfair prejudice if the defendant were to argue that more specific references to misappropriating classified information for the purpose of trading on prediction markets in subsequently issued guidance should be interpreted to mean that such conduct had not been prohibited at the time of the defendant's trading activity.

During the charged conduct, and substantially before it, the defendant was prohibited—by rules, regulations, nondisclosure agreements, and the law—from using confidential or classified Government information to turn a personal profit. For example, the Code of Federal Regulations prohibited Government employees, including the defendant, (i) from "us[ing] their public office for their own private gain," 5 C.F.R. § 2635.702); and (ii) from engaging in "financial transactions using nonpublic information," 5 C.F.R. § 2635.703(a). It also codified that the defendant "has a duty to protect and conserve Government property and may not use such property, or allow its use, for other than authorized purposes." 5 C.F.R. § 2635.704; Joint Ethics Regulation, May 15, 2024, ¶ 2-101 ("enlisted members of the Military Services are subject to the provisions of 5 C.F.R. Parts . . . 2635").[7] Further, and as explained above, the defendant owed a fiduciary duty of loyalty and confidentiality to his employer, and he signed multiple nondisclosure non-disclosure agreements concerning his work for the government. All of these obligations were binding on the

[7] *Available at* https://dodsoco.ogc.osd.mil/Portals/102/Documents/Issuances/JER%20and%20Directives/JER%20May%2015%202024.pdf?ver=wgio-EYYh3yW5rTyL9Tn5A%3D%3D (last accessed Oct. 24, 2026).

defendant during the period of the charged conduct—from December 2025 through January 2026. (Ind. ¶¶ 18, 20, 22, 24, 25.)

After the charged conduct, on February 17, 2026, referencing 5 C.F.R. § 2635.702, 7 U.S.C. § 6c, 17 C.F.R. § 180.1, the Uniform Code of Military Justice, and 18 U.S.C. § 793, the Army "established [a] policy regarding participation in predictive market platforms and traditional betting markets."[8] That policy was consistent with the aforementioned C.F.R. prohibitions and existing law. It stated that employees subject to that command, which included the defendant at all relevant times, "may not use positions of trust within this Unit and the United States government for private gain or profit." On October 20, 2026, the Secretary of War signed a memorandum that stated, among other things, that DoW "personnel are prohibited from engaging in financial transactions using nonpublic information. . . . This prohibition applies whether the transaction is informed by classified or unclassified information. The prohibition also applies to all financial platforms, including traditional betting platforms and prediction markets." (*See* Dkt. No. 47 at 20 n.13).

The issuance of the Army's February 2026 policy and DoW's October 2026 memorandum, both after the charged conduct, are not relevant and are therefore inadmissible under Rules 401, 402 and 403.

To start, the February 2026 policy and October 2026 memorandum cannot be relevant to the defendant's *mens rea* at the time of the offense. The defendant may be able to argue, if admissible evidence supports it, that the restrictions barring his use of sensitive or classified information were unclear to him or, perhaps, that he did not intend to violate them. But the

[8] The Government produced the February 17, 2026 policy to the defendant in discovery and can furnish a copy to the Court upon request.

defendant cannot seriously contend that policies issued weeks and months *after* his trading activity ended on January 3, 2026 had any bearing on his thought process or intent during the charged conduct. For this reason alone, evidence of the policy and memorandum should be precluded.

Nor are the February policy and the October memorandum probative of the restrictions governing the use of classified military operations in place at the time of the charged conduct, and therefore the defendant cannot use them to claim that the Government did not treat classified information as confidential or that his trading was permitted. This is obvious. To say nothing of law, regulations, and the agreements and acknowledgments the defendant signed, policies implemented *after* the defendant's misconduct are not relevant to the confidentiality protections that were in place at the time of the offenses. This concept is on all fours with a Supreme Court teaching from long ago that "the taking of . . . precautions against the future is not to be construed as an admission of responsibility for the past." *Columbia & P. S. R. Co. v. Hawthorne*, 144 U.S. 202, 207 (1892). The fact that a homeowner may buy a new home security system after a burglary does that mean that the old house alarm did not exist or that the owner was somehow negligent. The defendant may question witnesses about what policies, procedures, or trainings were, or were not, in place during the charged conduct without discussing the February policy and October memorandum.

Even if there is some limited relevance to these post-offense conduct announcements, their introduction would sow jury confusion. Admission of policies that post-date the defendant's conduct is likely to confuse the jury about the confidentiality rules actually in effect at the time of the defendant's conduct. It would also invite speculation about why the February policy and October memorandum were issued and risks unnecessarily complicating the trial by creating a minitrial over the Army's and DoW's reasons for issuing those documents. That minitrial threat is

particularly acute given that multiple regulations and agreements already in place at the time prohibiting the defendant's actions. More importantly, the jury is not tasked with determining the Army's or DoW's intent for announcing later policies. Its assignment is to decide whether the Government has proven that the defendant possessed the requisite intent when he engaged in the prediction-market trades.

Even more, introduction of the policy and memorandum would compound jury confusion because the October policy references laws that were in place at the time of the charged conduct, including a statute (7 U.S.C. § 6c) and a C.F.R. section (17 C.F.R. § 180.1) that undergird Counts One, Two, and Three of the Indictment. This poses additional problems under Rule 403. First, if the later-amended policies were introduced at trial, the defense may use them to argue—incorrectly and misleadingly—that prediction-market trading was permissible (or that it was unclear whether it was permissible) until they were issued. Second, even if that argument were precluded, a juror confronted with the policy may incorrectly speculate or wonder the same. Third, the October policy, which cites laws in the Indictment, could encroach on the Court's role in instructing the jury and cause the jury to improperly use the policy, and memorandum, to consider their instructions.

Accordingly, the Court should preclude introduction of, and argument regarding, the October policy and February memorandum.

## X. The Court Should Preclude Any Mention of or Allusion to Potential Punishment for the Defendant, Including References to the Defendant's "Freedom" or "Liberty," His Life Being in the Jury's Hands, the Defendant Not Deserving Prison, or Requests that the Jury, in Substance, Send the Defendant "Home" or "Back to His Family" With a Verdict of Not Guilty.

The defendant should be precluded from offering evidence or argument, or otherwise mentioning in any way, any potential sentencing consequences resulting from a conviction. Where

the jury has no role at sentencing—as in this case—the jury "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is for good reason: Argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* As a result, "'[c]ourts have routinely precluded evidence of possible punishment,'" *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (quoting *United States v. Del Rosario*, No. 12 Cr. 81 (KBF), 2012 WL 2354245, at *2 (S.D.N.Y. June 14, 2012)), as well as other "arguments aimed at jury nullification," *Reese*, 933 F. Supp. 2d at 583. Accordingly, in the interest of permitting the jury to reach a verdict untainted by improper considerations, this Court should preclude the defendant from any mention of potential punishment.

The Court should also preclude any attempt to circumvent and undermine this well-settled law through thinly veiled references to potential punishment. For example, the Court should not allow any statements to jury that the defendant's "freedom" or "liberty" is at stake in this case, that his "life is in their hands," that the defendant does not "deserve to go to prison," or that the Government has not produced sufficient evidence to "take away" the defendant's freedom or liberty. Such arguments—arguments to which enterprising defense attorneys sometimes resort—would cause the jury to contemplate the potential punishment of imprisonment. Furthermore, the Court should preclude any suggestion by defense counsel that the jury should, in substance, send him "home" or "back to his family" with a verdict of not guilty. *See, e.g.*, *United States v. Combs*, No. 24 Cr. 542 (AS), Trial Tr. at 7904 (June 27, 2025) ("Mr. Agnifilo: … return him to his family, who have been waiting for him."); *United States v. Buck*, No. 13 Cr. 282 (JSR), Trial Tr. at 1989 (Oct. 30, 2017) ("Mr. Agnifilo: … "I ask that you go back into the jury room at the end of this

case, and you let Mr. Buck go back to Switzerland."). Such statements would wrongfully imply that the defendant is now in custody and would also impermissibly imply that, if the jury returns a verdict of guilty, the defendant will not return home or to his family, but, rather, will be incarcerated. To ensure the integrity of the jury's process, the Court should not only preclude all explicit references to potential punishment, but also any back-door attempts to implant the prospect of punishment in the jury's mind. *See In re Manzano*, 945 F.3d 616, 631 (2d Cir. 2019) ("[I]f the district court finds that [the defendant] is . . . seeking to introduce evidence of sentencing consequences solely for the purpose of encouraging nullification, the court must exclude that evidence as irrelevant."). Here, there is no permissible reason to introduce evidence of sentencing consequences, and thus, the defendant should be prohibited from doing so.

**CONCLUSION**

For the reasons set forth above, the Court should grant the Government's motions *in limine*.

Dated: New York, New York
October 26, 2026

Respectfully submitted,

SEAN S. BUCKLEY
Deputy United States Attorney
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

By: /s/ ______________________________
Nicholas W. Chiuchiolo
Ryan B. Finkel
Juliana N. Murray
Assistant United States Attorneys
26 Federal Plaza, 37th Floor
New York, New York 10278
Telephone: (212) 637-1247 / 6612 / 2314

**CERTIFICATION**

The undersigned hereby certifies that the memorandum of law in support of the Government's motions *in limine* complies with the Court's individual rules of practice. The word count is 8,635 words.

Respectfully submitted,

SEAN S. BUCKLEY
Deputy United States Attorney
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

By: ______________________________

Nicholas W. Chiuchiolo
Ryan B. Finkel
Juliana N. Murray
Assistant United States Attorneys
26 Federal Plaza, 37th Floor
New York, New York 10278
Telephone: (212) 637-1247 / 6612 / 2314